# EXHIBIT 3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD J. MILLER, on behalf : Civil Action
of  himself and all others  :
similarly situated,          :
       Plaintiff,     : No. 12-1715
    -v-                     :
TRANS UNION, LLC,            :
      Defendant.       : CLASS ACTION
-----------------------------------------
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

BRIAN DOUGLAS LARSON, on    :  Case No.
behalf of  himself and all  :
others similarly situated,  :
       Plaintiff,     :
    -v-                     :
                     :
TRANS UNION, LLC,            :
      Defendant.       :  3:12cv-05726
-----------------------------------------

CONFIDENTIAL DEPOSITION

    Oral videotaped deposition of JAMES GARST,

taken at 1450 East Touhy Avenue, Des Plaines,

Illinois, on Tuesday, November 4, 2014, beginning

at approximately 9:00 a.m., before Elvira Molnar,

Certified Shorthand Reporter of the State of

Illinois.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

1          Will you be able to give testimony on

2    that?

3         A.   Yes.

4         Q.   Thank you.  And I can tell that you're

5    anticipating some of my questions.  I will just

6    give you an instruction to please wait until I am

7    done, and then I'll give you the same courtesy of

8    waiting until your full answer is done, because

9    that just makes it easier for the court reporter to

10   take down one of us at a time, okay?

11        A.   Uh-huh.

12        Q.   Is that a yes?

13        A.   Yes.

14        Q.   Another instruction is even though we do

15   have a video, I would request that you give me oral

16   responses so we have a clear transcript, as well,

17   okay, sir?

18        A.   Yes.

19        Q.   Now, another topic where I understand you

20   will be prepared to give testimony today speaking

21   for Trans Union is Subject C of Garst 1, where it

22   asks for Trans Union's quality control measures and

23   testing for online communications of information to

24   consumers concerning OFAC alerts or other OFAC

1    related information from February, 2008, to the

2    present.

3            Do you see that?

4        A.   Yes.

5        Q.   And are you able to give testimony on that

6    subject matter for Trans Union today?

7        A.   Yes.

8        Q.   I believe Garst 2 has virtually the same

9    exact question to cover communications related in

10   the Larson case.

11           You're able to give testimony on that

12   subject matter?

13       A.   Yes.

14       Q.   And I believe the last subject area for

15   which you are designated to give some testimony

16   today is in the Miller case, and that is Subject E

17   of Garst 1.  It asks for any sale of OFAC alert or

18   OFAC related information on any reports sold to any

19   third party, so that would be a bank, for example,

20   about the plaintiff, Mr. Miller, from 2007 to the

21   present.

22           Are you able to testify about that?

23       A.   Yes.

24       Q.   Okay.  So, the subject of your testimony

JAMES GARST-CONFIDENTIAL

1  do all the work yourself?

2      A.    No.

3      Q.    How did you have responsibilities in

4  overseeing some of these projects?

5      A.    The way I would explain it is a dotted

6  line type of responsibility where I did not have --

7  I did not have associates working for me.  However,

8  I was responsible for ensuring that they were

9  working -- working on various projects and

10  delivering appropriately.

11      Q.    So, would it be accurate to say that you

12  work with a team of people at Trans Union, even

13  though those people you did not directly supervise?

14      A.    Correct.

15      Q.    And how big a team would it have been?

16      A.    Over the course of the several years that

17  I was either a project manager or a program

18  manager, it's in the hundreds.  I would estimate

19  about 200.  At any given time the highest number of

20  people that were working on projects or in the

21  program that I was responsible for was about 85.

22      Q.    Are you familiar with the circumstances of

23  a project to change the online disclosure to

24  consumers at Trans Union so that consumers could

1    see information relating to OFAC alerts when they

2    seek to view their consumer files online?

3        A.    Yes.

4        Q.    And was that one of the projects that you

5    were responsible for in the time period that you

6    were program manager of consumer relations systems

7    to see that that was carried out properly?

8        A.    Yes.

9        MR. NEWMAN:  Wait.  Wait for him to finish his

10   question.

11       THE WITNESS:  I'm sorry.  I'm sorry.

12   BY MR. SOUMILAS:

13       Q.    Did you internally have a name for that

14   project?

15       A.    I do not recall what the name for that

16   project.

17       Q.    Let's call it something short for today.

18   Could we call it the online OFAC disclosure project

19   in 2011?

20       A.    Yes.

21       Q.    Okay.  Did it get rolled out in the year

22   2011?

23       A.    Yes.

24       Q.    All right.  So, we are just going to call

JAMES GARST-CONFIDENTIAL

1   it the online OFAC disclosure project, and we are

2   going to be talking for purposes of 2011, unless I

3   ask you a different question or different time

4   frame, okay?

5       A.   Okay.

6       Q.   Would you say that that was one of the

7   projects that you were responsible for to see that

8   it was carried out properly?

9       A.   Yes.

10      Q.   And was that also one of the projects

11  where you worked with a team?

12      A.   Yes.

13      Q.   Do you remember the people on that OFAC

14  disclosure -- online disclosure team?

15      A.   I remember two specifically.

16      Q.   Who were they?

17      A.   The project manager, Brian Thackrey.

18      Q.   Spell the last name for me.

19      A.   T-H-A-C-K-R-E-Y.

20      Q.   Okay.  And who is the other person?

21      A.   The tech lead at the -- for the

22  development team.  Saneal -- I always say Saneal G,

23  because it is -- I want to say Gonaypathen

24  (phonetic).  I am not sure what the spelling of his

JAMES GARST-CONFIDENTIAL

1    Q.   And the tech lead, Saneal G, we are both

2  having a difficult time with the last name, so

3  we'll just call him Saneal G, why does he stand out

4  in your memory?

5    A.   Because as the tech lead he is the -- he

6  is the primary responsible for the development team

7  and testers responsible for delivering the

8  function.

9    Q.   So that I understand this in plain

10 English, I understand your work is technical in

11 nature, but when we are talking about developing,

12 are we talking about writing the code that will

13 make the disclosure work?

14   A.   Yes.

15   Q.   And when we are talking about testing, are

16 we talking about quality control testing to make

17 sure that it works, the disclosure works, as it's

18 supposed to?

19   A.   Yes.

20   Q.   Okay.  And is Saneal G the person

21 primarily responsible for both the initial code

22 writing and the testing?

23   A.   Yes.

24   Q.   Mr. Garst, are you technically familiar

JAMES GARST-CONFIDENTIAL

1    A.    Not to my knowledge.

2    Q.    Okay.  During the time period when you

3    were program manager for consumer relations

4    systems, did you yourself personally engage in the

5    testing of any code to see that it was working

6    properly?

7    A.    During some projects I did some testing.

8    Q.    In other projects you had oversight

9    responsibility, but you didn't do the testing

10   yourself?

11   A.    Correct.

12   Q.    But you're familiar with how to do it?

13   A.    Yes.

14   Q.    Have you ever seen projects that you have

15   supervised where the testing had failed and the

16   program did not function as it should?

17   A.    Yes.

18   Q.    How many times?

19   A.    I couldn't estimate.  Defects, what we

20   call defects, are relatively common in software

21   development.

22   Q.    So, when you say defects, is that also

23   sometimes we hear that there is a bug in the

24   program?

1     A.    Yes.

2     Q.    So, is that a relatively frequent

3  occurrence in your experience where there is a bug

4  in a program?

5     A.    Relatively frequent, yes, from a minor --

6  a minor bug or minor defect standpoint, yes.

7     Q.    And are you familiar with other situations

8  where not even the quality control testing at

9  Trans Union caught the bug before the program was

10 rolled out?

11    A.    Yes.

12    Q.    How many such situations during your time

13 at Trans Union?

14    A.    I don't know.

15    Q.    More than 10?

16    A.    Yes.

17    Q.    More than 20?

18    A.    Yes.

19    Q.    More than 50?

20    A.    I don't know.

21    Q.    All right.  Let's shift gears for a moment

22 and talk about what, if anything, you did to

23 prepare to give testimony today on those five I

24 believe subject matters that we went over at the

1  conducted the inquiry to determine what the total

2  number of online disclosures with this OFAC header

3  were?

4      A.   Yes.

5      Q.   And you're familiar, obviously, with how

6  you arrived at the 13,100 number?

7      A.   Yes.

8      Q.   And then you have some spreadsheet that

9  tells you what?

10     A.   That lists each one of the consumers that

11 had the defect with the OFAC header text displaying

12 on their online disclosure without -- without

13 having an OFAC match.

14     Q.   And, so, for the consumers who had that

15 defect on their disclosure, you have a spreadsheet

16 with their names and addresses?

17     A.   No.  I have a spreadsheet with the key

18 consumer relations system information that

19 allows -- that would allow me to get to that

20 information.

21     Q.   All right.  So, you have some unique

22 information that would identify for us when that

23 disclosure occurred?

24     A.   Yes.

JAMES GARST-CONFIDENTIAL

1     Q.    And if without identifying information we

2     could figure out the name and the address of the

3     person who requested the disclosure?

4     A.    Yes.

5     Q.    And we'll get to that in a little bit more

6     detail, but for now I would like you to turn to

7     Garst 4, please.

8     A.    Thank you.

9     Q.    And I will represent to you, Mr. Garst,

10    that these are Trans Union's responses to the

11    plaintiff's first set of interrogatories in the

12    other lawsuit, which brings us here today.  That's

13    the Larson lawsuit.  Have you seen Garst 4 before?

14    A.    Yes.

15    Q.    And, again, this is one of the legal

16    documents that you believe you reviewed in

17    connection with preparing to give testimony today?

18    A.    Yes.

19    Q.    And, sir, if you look at Page 3 of this

20    document, it has a very similar question concerning

21    the number of affected consumers and an

22    approximation of 18,000 online disclosures

23    displaying the OFAC header in the State of

24    California.

1          Do you see that?

2      A.   Yes.

3      Q.   And do you have similar inquiry as you did

4   in the Miller case concerning a total number of

5   affected consumers?

6      A.   Yes.

7      Q.   And do you have an Excel spreadsheet with

8   the same type of information?

9      A.   Yes, it is a single Excel spreadsheet for

10  both sets of information, both the Miller and the

11  Larson.

12     Q.   Got it.  And from that spreadsheet again

13  then we can derive dates of the disclosures and

14  names and addresses of the consumers for all the

15  affected consumers in both cases, is that correct?

16     A.   Yes.

17     Q.   All right.  I would like you to please

18  next take a look at what we marked as Garst 5 for

19  purposes of today.

20     A.   Thank you.

21     Q.   Now, sir, I'll represent to you that

22  that's something that my office produced to

23  Trans Union in this case.  It is a printout of what

24  I understand to be an online Trans Union file

1  disclosure provided by Trans Union to the plaintiff

2  Ronald J. Miller.  Do you see that?

3       A.   Yes.

4       Q.   Are you familiar with this form of

5  disclosure?

6       A.   Yes.

7       Q.   Does it look to you to be a printout of a

8  Trans Union online file disclosure?

9       A.   Yes.

10      Q.   And if you look at the -- you see the

11  pages have little numbers at the bottom that start

12  Miller 1?

13      A.   Uh-huh.

14      Q.   We call those Bates numbers.  If you look

15  at Bates No. 4, please.  Do you see that?

16      A.   Yes.

17      Q.   That has a possible OFAC match header in

18  the additional information section, correct?

19      A.   Correct.

20      Q.   So, have you seen this document before?

21      A.   Yes.

22      Q.   And is this the OFAC header for which you

23  searched when you did those inquiries for the total

24  number of affected consumers in the jurisdiction of

1    the third circuit and also in the State of

2    California?

3        A.    Not -- no.  I did not have the ability to

4    search for the OFAC header itself.  I -- my queries

5    searched for the data conditions that led to the

6    OFAC header appearing.

7        Q.    Okay.  So, would you explain that for the

8    record in some more detail?

9        A.    Sure.  The defect occurred -- the defect

10   of the OFAC header text displaying when it should

11   not have displayed occurred whenever there was any

12   other additional information present on a

13   consumer's file for their disclosure delivered

14   online during the time period of the issue.  The

15   other information that would be there that would

16   have triggered this defect and this display of the

17   header information was either inquiry analysis data

18   being present on the file or a special message.  I

19   believe it's called special messages on here.  Yes,

20   special messages.

21       Q.    Okay.  So, to summarize, your inquiry was

22   for the defect as you called it?

23       A.    Yes.

24       Q.    And you agree with me that the document

1    that we have here as Garst 5 for Mr. Miller

2    contained the defect that you searched for?

3        A.   Yes.

4        Q.   And namely the defect had an OFAC message

5    delivered to the consumer, even though one should

6    not have been there at all, correct?

7        A.   Yes.  It had the OFAC header text

8    displayed, even though it should not have

9    displayed.

10        Q.   And the OFAC header text should not have

11    displayed because there is no OFAC match or

12    possible match between this consumer and anything

13    on the OFAC list, correct?

14        A.   Correct.

15        Q.   And am I also correct that part of the

16    defect was that that section under possible OFAC

17    match, the bottom says the OFAC record that is

18    considered a potential match to the name on your

19    credit file is colon, and then there is just

20    nothing after the colon?

21        A.   Correct.

22        Q.   That's part of the defect, correct?

23        A.   Correct.

24        Q.   So, the way the program was supposed to

JAMES GARST-CONFIDENTIAL



Redacted

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    defect was in the appearance of the OFAC header

2    with a colon and nothing afterwards in situations

3    where it should not have appeared at all?

4        A.   Yes.

5        Q.   All right.  The language of the OFAC match

6    header you don't consider to be a defect, correct?

7        MR. NEWMAN:  Objection, outside the scope of

8    the notice.  Go ahead.

9    BY MR. SOUMILAS:

10       Q.   Let me ask it another way.

11            If a program worked as it should, and

12   there was an actual match between a credit

13   applicant and the OFAC list, would you agree with

14   me that the OFAC header would appear here, would

15   appear on the file disclosure?

16       A.   Yes.

17       Q.   And also the matching information from the

18   OFAC list should appear after the colon, correct?

19       A.   Correct.

20       Q.   So, if let's say that there was a match

21   between an applicant named Charles Taylor and a

22   match on the former Liberian president

23   Charles Taylor, that would be a situation where the

24   OFAC header would appear with information after the

1    colon concerning the possible match?

2        MR. NEWMAN:  Objection, incomplete

3    hypothetical.  Go ahead.

4    BY MR. SOUMILAS:

5        Q.    Is that correct?

6        A.    Yes, if Charles Taylor is on the OFAC

7    list.

8        Q.    Right.  And in situations where -- in

9    situations like that where there is someone who is

10   considered to be a potential match, Trans Union

11   continues to use this OFAC header, correct?

12       MR. NEWMAN:  Objection.  Go ahead.

13       THE WITNESS:  My understanding is that yes we

14   continue to use the OFAC header.

15   BY MR. SOUMILAS:

16       Q.    Trans Union considers nothing defective

17   about the header itself, correct?

18       MR. NEWMAN:  Objection, outside the scope of

19   the notice, but go ahead.

20       THE WITNESS:  I am not aware of any current

21   defects related to the OFAC header text or

22   delivery.

23   BY MR. SOUMILAS:

24       Q.    Okay.  And the defect you specifically

1  searched for is the appearance of the header data

2  with a colon and nothing afterwards in situations

3  where it should not have appeared at all but did

4  because of a programming error, correct?

5      A.   Correct.

6      Q.   And that error somehow caused the OFAC

7  header with a colon and no matching data afterwards

8  to appear in situations where the consumer simply

9  had an inquiry analysis or any special message as

10  part of the additional information section of their

11  file, is that also correct?

12      A.   Correct.

13      Q.   All right.  And that's the case for

14  Mr. Miller as we see here in Garst 5, correct?

15      A.   Uh-huh.

16      Q.   Is that a yes, sir?

17      A.   Yes.

18      Q.   And that's also the case for Mr. Larson,

19  which we see as part of Garst 6, would you agree

20  with that?

21          Yes, please take a look at Garst 6.

22      A.   Yes, I would agree with that.

23      Q.   So, both the Miller disclosure that we

24  have as Garst 5 and the Larson disclosure that we

1  have as Garst 6 suffer from the same defect,

2  correct?

3      A.   Yes.

4      Q.   And let's talk a little bit more about how

5  that came to be.  Are you familiar with when

6  Trans Union originally made any OFAC information

7  available as part of the online disclosures to

8  consumers?

9      A.   We deployed the functionality to display a

10  possible OFAC match section in September of 2011.

11      Q.   Do you remember the exact date?

12      A.   September 22nd, I believe.

13      Q.   And was that functionality not implemented

14  in any form prior to September 22, 2011?

15      A.   Not for the online disclosure.

16      Q.   Okay.  So, could you explain that?

17      A.   Prior to September 22nd, 2011, if the

18  system would check if there was an OFAC message

19  present, it would not deliver the disclosure online

20  if an OFAC message was present.

21      Q.   But if a consumer were to ask for their

22  file disclosure to be mailed to them in paper

23  format at their home, would the system disclose a

24  possible OFAC match?

1     A.    Yes.

2     Q.    Okay.  So, there was a period of time for

3  which there was a possible OFAC match header as you

4  called it as part of paper disclosures, but not

5  online disclosures?

6     A.    Correct.

7     Q.    Do you know when the possible OFAC match

8  header started appearing on the paper disclosures

9  at Trans Union?

10    A.    In February of 2011.

11    Q.    And do you know why at that time the

12 online file disclosures would not show the same

13 thing as the paper version?

14    A.    I don't recall.

15    Q.    Were you involved at all with the project

16 to add the OFAC data header to the paper

17 disclosures in February, 2011?

18    A.    As I was the project -- for the program

19 manager at the time, yes, I would have been the

20 program manager for that project, as well.

21    Q.    Do you have any recollection as to why

22 that additional disclosure field was rolled out at

23 two different time periods; one for the paper

24 disclosures and, then, later about eight months

1    later for the online disclosures?

2       A.   I don't remember the specifics of that

3    decision.

4       Q.   Do you recall who else -- you said you

5    were the project manager for the paper disclosures

6    in February of 2011?

7       A.   The program manager.

8       Q.   Program manager.  Who was the project

9    manager?

10       A.   I don't recall.

11       Q.   Looking back on it, was it Trans Union's

12    intention to not include the OFAC header in online

13    disclosures until a period of time later than the

14    paper disclosures, or was that just an oversight?

15       MR. NEWMAN:  Objection, misstates testimony.

16    Go ahead.

17    BY MR. SOUMILAS:

18       Q.   Do you understand my question?

19       A.   I do understand the question.  It to my

20    remembrance it was not an oversight.  It would have

21    been a deliberate decision based on -- based on

22    variables at the time.

23       Q.   And what do you mean by that?

24       A.   I can speak in generality about the

**JAMES GARST-CONFIDENTIAL**

1   different variables that could cause us to make a

2   decision like that, even though I don't remember

3   the specifics of this one, but there are times --

4   there are times when program development schedules

5   cannot line up in such a way so that the same

6   functionality can be delivered in all channels at

7   the same time because of code that is shared with

8   other -- other areas of the organization that

9   cannot change at that time because of the

10  application.  I have mentioned the receiving

11  application.  So the web site or the print vendor.

12  Their schedules and not being able to deliver the

13  data in exactly the same time or deliver that

14  functionality at exactly the same time as others.

15       Q.   Do you know how it came about that in the

16  September, 2011, time frame Trans Union decided

17  that it was going to include the OFAC section in

18  the additional information section of files, file

19  disclosures?

20       A.   I don't -- I don't recall the specifics of

21  how it came about.  I recall that we definitely

22  knew that the OFAC header and the OFAC potential or

23  the possible OFAC match section needed to be on all

24  disclosures.

1   was the vendor that we used.

2       Q.   And that's upper case S-a-k-s and, then,

3   upper case S-o-f-t, correct?

4       A.   I -- I am not sure.  I have always written

5   it as upper case S-a-k-s-o-f-t with no space.

6       Q.   Okay.  How long has Trans Union used

7   Saksoft for any code writing jobs?

8       A.   I don't know.

9       Q.   Have you worked with that entity before?

10      A.   Yes.

11      Q.   For how long?

12      A.   I don't know specifically.  I can say

13  several years.

14      Q.   Has Saksoft done any projects for you

15  where they programmed code for online disclosures

16  to consumers?

17      A.   Yes, they were the primary development

18  team for any changes that we needed to make for the

19  online disclosure functionality.

20      Q.   For how long?

21      A.   I can say for several years.

22  Brian Thackrey is the best one to ask on that.

23      Q.   Brian Thackrey works for Trans Union?

24      A.   Yes.

* REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED *

**JAMES GARST-CONFIDENTIAL**

1    Q.    Would he be the person primarily

2    responsible for hiring Saneal G's team at Saksoft?

3    A.    No.

4    Q.    Who would do that hiring?

5    A.    I don't know.

6    Q.    By 2011 was it understood that Trans Union

7    had a well enough established relationship with

8    Saksoft that if a project was going to have to be

9    handled concerning certain code to add information

10   to the online disclosure that that code was going

11   to be written and tested by Saksoft?

12   A.    Yes.

13   Q.    Did the online disclosure, which would

14   include for the first time the any additional

15   possible OFAC match information, in fact, go online

16   and became available to consumers on September 22,

17   2011?

18   A.    To my understanding, yes.

19   Q.    Did it have the defect that you identified

20   earlier in this deposition?

21   A.    Yes.

22   Q.    From the very first day?

23   A.    Yes.

24   Q.    And how do you know that?

1    A.    Because when we discovered the defect in

2  -- later in October, we used the support tool for

3  to view the online disclosures that were delivered

4  as far back as when we deployed the functionality

5  on September 22nd and saw the error.

6    Q.    Would you conclude from that that the

7  defect was a result of the original coding for that

8  online disclosure?

9    A.    For that change to the online disclosure,

10  yes.

11    Q.    And would you agree with me that the

12  testing, whatever testing was conducted before the

13  online OFAC disclosure went online on September 22,

14  2011, did not catch the defect?

15    MR. NEWMAN:  Objection, misstates testimony.

16  Go ahead.

17  BY MR. SOUMILAS:

18    Q.    Well, let me break it down.  Are you of

19  the opinion that there was some testing before

20  September 22nd, 2011, to make sure that the OFAC

21  online disclosure was functioning properly?

22    A.    Yes, that was my understanding.

23    Q.    Okay.  And would you agree with me that

24  whatever testing of that code was conducted prior

1  to September 22nd, 2011, did not catch the defect?

2      A.   Yes.

3      Q.   The defect was detected later in October

4  you said, correct?

5      A.   Yes.

6      Q.   How did it come -- first come to

7  Trans Union's attention that this defect existed

8  for the online OFAC disclosure?

9      A.   My understanding is that around it was

10  either October 19th or October 20th we got reports

11  from our consumer relations operations group that

12  they were getting phone calls from consumers about

13  seeing the possible OFAC match section on their

14  online disclosures and wanting to dispute it.

15      Q.   Who from consumer relations brought that

16  to whose attention?

17      A.   It was either Lisa Dickens or Denise

18  Burdell, but I can't recall which one of them

19  exactly.

20      Q.   And they brought it to your attention?

21      A.   No.  It was brought to somebody else's

22  attention.

23      Q.   Who -- whose attention was it brought to?

24      A.   I believe it's Brian Thackrey, but I don't

JAMES GARST-CONFIDENTIAL

1    recall exactly.

2        Q.   And is it your understanding that there

3    were consumers who were calling Trans Union with

4    questions or disputes about this OFAC information

5    appearing on their files?

6        A.   It was presented to us as the operations

7    group has operators that are trying to dispute the

8    presence of the OFAC message on consumers' files

9    and not able to do it because that functionality

10   required an OFAC message to be present in order to

11   dispute it.  And since these consumers did not

12   actually have an OFAC message present, they could

13   not dispute it.

14       Q.   So, let me see if I understand this.  The

15   consumers relations operators were trying to

16   process disputes to remove inaccurate OFAC matches,

17   is that correct?

18       A.   They were getting requests from consumers

19   to remove OFAC -- the possible OFAC match, you

20   know, from the consumer's credit report and were

21   unable to.

22       Q.   And the reason why they were unable to is

23   because of this defect, correct?

24       A.   Yes, because the defect -- the defect only

JAMES GARST-CONFIDENTIAL

1    appeared on the online web site itself.  The core

2    consumer relations system that the operators use

3    did not have that defect and did not see an OFAC

4    message present.

5        Q.    So, the operators who would be handling

6    the consumer calls couldn't even really see what

7    the consumers were talking about?

8        A.    That's correct.

9        Q.    How many consumer calls did Trans Union

10   receive between September 22, 2011, when the

11   disclosure for OFAC went online and October 19th or

12   20th when someone from consumer relations brought

13   it to probably Mr. Thackrey's attention?

14       A.    I don't know.

15       Q.    Is there a way of finding that out?

16       A.    Not to my knowledge.

17       Q.    Do you have any reason to believe that

18   the -- there were not calls of that nature

19   throughout the month period between September 22,

20   2011, and October 19th or 20th, 2011?

21       A.    I don't have any way to answer that.  I

22   don't know if -- I don't know if there were calls

23   or not.  The -- historically the consumer relations

24   operations group was very good at notifying us when

**JAMES GARST-CONFIDENTIAL**

1  -- notifying the IT team when there were issues

2  that they were hearing about from consumers.  So, I

3  would have expected if we were getting -- if we

4  were getting a fair number of calls to our consumer

5  relations operations center, I would have expected

6  that we would have heard about it earlier.

7       Q.   Do you have any reason to believe that the

8  defect that you have testified about was not

9  present during the entire period from September 22

10 until about October 19th or 20th?

11      A.   No.

12      Q.   You think the defect was there from the

13 initiation of the project online on September 22,

14 2011, through at least the time it was brought to

15 someone's attention in the IT group on October 19th

16 or 20th, correct?

17      A.   Correct.

18      Q.   And what's your understanding as to what

19 the consumer relations systems operators would do

20 to address these consumer concerns?

21      A.   They would -- the way -- my understanding

22 of the way it works is they would try to use the

23 OFAC dispute functionality in the system, which is

24 a button, and it would not work for them, and

1    for those consumers because the system does not

2    allow disputing when there is no presence of the

3    OFAC message there itself.  So, I did not -- I did

4    not find -- I did not find OFAC disputes in the

5    system.

6        Q.   Got it.  But you know there must have been

7    disputes, otherwise Ms. Burdell or Ms. Dickens

8    would have had nothing to bring to your attention?

9        A.   Correct.

10       MR. NEWMAN:  Wait for him to finish the

11   question.

12       THE WITNESS:  I understand.  Correct, I am

13   aware of phone calls, phone calls to consumer

14   relations operators complaining or disputing that

15   the presence of the OFAC header information on

16   their files.

17   BY MR. SOUMILAS:

18       Q.   Do you know how -- what percentage of

19   online file disclosures suffered from this defect?

20       A.   On Friday the 21st I did an analysis of

21   all of the disclosures on the 20th that were

22   delivered online on October 20th and found that

23   about 35 percent of the online disclosures

24   delivered would have had the issue based on the

JAMES GARST-CONFIDENTIAL



JAMES GARST-CONFIDENTIAL



Redacted

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

JAMES GARST-CONFIDENTIAL



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**JAMES GARST-CONFIDENTIAL**

1    tracked because the system would just not allow it

2    to be tracked because of this defect?

3         A.   Correct.

4         Q.   All right.  But once the problem is

5    brought to your attention, your team's attention,

6    October 19th and 20th, do they fix it?

7         A.   We fixed it.  We fixed it by October 28th.

8         Q.   How long did the fix take?

9         A.   Can you -- I don't understand the

10   question.

11        Q.   Okay.  Strike the question, actually.

12             Other than consumers, did anybody else

13   bring to Trans Union's attention that this defect

14   was causing OFAC information to appear on the

15   consumer files of consumers who had no association

16   with the OFAC list whatsoever?

17        A.   It was brought to our attention on

18   October 27th that the treasury -- Department of the

19   Treasury, the actual OFAC office had called our

20   legal counsel to let them know that they had been

21   getting calls from consumers.

22        Q.   So the Department of the Treasury OFAC

23   office brought this defect to Trans Union's

24   attention for the first time on October 27th,

JAMES GARST-CONFIDENTIAL



Redacted

1    BY MR. SOUMILAS:

2        Q.    Do you have -- have you reviewed any

3    record of any quality control testing conducted by

4    Trans Union concerning the 2011 OFAC online

5    disclosure prior to it being rolled out on

6    September 22nd, 2011?

7        A.    Not in any of the materials that I

8    reviewed.

9        Q.    Okay.  Have you reviewed any record of any

10   quality control testing by Saksoft concerning the

11   OFAC online disclosure prior to October 22nd, 2011?

12       A.    No, not in any of the materials I

13   reviewed.

14       Q.    Would you agree with the proposition that

15   the testing failed to catch the defect?

16       MR. NEWMAN:  Objection, vague as to time.

17   BY MR. SOUMILAS:

18       Q.    The testing failed to catch the defect

19   prior to it being rolled -- the online disclosure

20   being rolled out on September 22nd, 2011?

21       A.    Yes.

22       Q.    And what could have been done in your

23   experience to avoid that defect in the first place?

24       A.    In my experience overall you could do more

JAMES GARST-CONFIDENTIAL

1  testing.  You could involve more people doing the

2  testing.  You could -- those were the two -- those

3  are the two main concepts I would introduce.

4      Q.   All right.  And more testing are you

5  talking about a review of the code after it's

6  written, is that part of the testing that could

7  have been done?

8      A.   Yes.  So, testing could include more

9  deeper code review with -- with additional people.

10  It could involve performing more test cases, you

11  know, against that code.  Things like that.

12      Q.   So, you're familiar with dynamic testing

13  of software programs?  Are you familiar with that

14  concept?

15      A.   I am not familiar with the concept of

16  dynamic testing.  I don't know what that is.

17      Q.   Okay.  Are you familiar with static

18  testing of computer programs like these?

19      A.   This -- not this specific terminology.

20      Q.   Okay.  Are you familiar with white box

21  testing?

22      A.   I am familiar with it, but could not

23  explain it.

24      Q.   How about black box testing?

1      A.    Again, I am familiar with it, but could

2   not explain it.

3      Q.    How about gray box testing?

4      A.    I am not familiar with that.

5      Q.    Okay.  Are you aware of how many test

6   cases the code was tested on prior to September 22,

7   2011, before it went online, to determine whether

8   it was working properly?

9      A.    No.

10      Q.    Are you familiar with how many test cases

11   Trans Union would typically run to test an online

12   disclosure before making it available to the

13   general public?

14      A.    Typically for the full disclosures there

15   are hundreds of test cases.

16      Q.    How many hundreds?

17      A.    I don't know specifically.

18      Q.    How many test cases were conducted with

19   respect to the OFAC online disclosure prior to

20   September 22, 2011?

21      A.    I don't know.

22      Q.    Do you know how much money Trans Union

23   paid Saksoft for its programming services to roll

24   out the online OFAC disclosure prior to

1    Q.   You are here to testify on behalf of

2  Trans Union, Mr. Garst, on the subject of quality

3  control measures and testing for online

4  communications of information to consumers

5  concerning OFAC alerts.  What specific item of

6  quality control testing are you familiar with which

7  Trans Union conducted prior to rolling out the

8  online OFAC file disclosure on September 22, 2011?

9    A.   I am familiar with the general process and

10 procedure with which we developed and tested

11 applications.

12   Q.   Are you familiar with a single specific

13 test or quality control measure that was, in fact,

14 followed in the case of preparing the OFAC online

15 disclosure prior to September 22, 2011?

16   A.   Not specifically.

17   Q.   Would you agree with me that whatever

18 testing, if any, quality control testing was

19 conducted, it failed to catch this defect?

20   A.   I would agree.

21   Q.   Turning your attention, Mr. Garst, to

22 Garst 3 and 4.  Those were the interrogatory

23 responses.  You will recall that we had talked

24 about Interrogatory Response No. 1 in both exhibits

1  and that had to do with the total number of persons

2  who have this defect on their disclosure.  Do you

3  recall that?

4      A.   Yes.

5      Q.   Could you go about how you came to the

6  figures that are in these interrogatory responses?

7  And for the record I'll just repeat that the

8  figures that were provided to us in these responses

9  for the Miller case was 13,100.  And that's within

10  the jurisdiction of the third circuit, sir.  And in

11  the Larson case is for the State of California, and

12  that number is approximately 18,000.

13          Do you see that?

14      A.   Yes.

15      Q.   Please tell me how you arrived at those

16  numbers.

17      A.   First I understood the -- what the defect

18  was about.  So I got a clear understanding that the

19  defect was about the OFAC header, the possible OFAC

20  match header text displaying whenever inquiry,

21  analysis or special messages were present on the

22  online disclosure and an OFAC match was not present

23  on the online disclosure.

24          And, then, I created -- I wrote and ran

1    queries against the consumer relations system

2    database to find all online disclosures that had

3    either inquiry analysis data present or special

4    messages present, but did not have an OFAC match

5    present to find the totals.

6        Q.   All right.  So, let's just make sure I

7    understood this analysis step by step.  You are

8    looking at the database which contains information

9    about file disclosures being provided by

10   Trans Union to consumers?

11       A.   Correct.

12       Q.   And you're specifically focusing on those

13   cases where the consumer requests their Trans Union

14   file online, correct?

15       A.   Their disclosure online, correct.

16       Q.   File disclosure online as opposed to

17   asking for it to be mailed to them?

18       A.   Correct.

19       Q.   And you're looking for consumer requests

20   for Trans Union on file disclosures that basically

21   meet the following conditions:  Number one, there

22   is additional information for an inquiry analysis

23   present, correct?

24       A.   Correct.

1    Q.    Or there is a special messages section

2  displaying, correct?

3    A.    Correct.

4    Q.    But no actual OFAC match to that file,

5  correct?

6    A.    Correct.

7    Q.    So, when those three things come together,

8  and we have either, either an inquiry analysis or

9  special messages, and no actual OFAC match, then

10  you know that there was a disclosure sent out

11  online that had this defect?

12    A.    Correct.

13    Q.    And the time period would have been from

14  September 22, 2011, through October 28, 2011?

15    A.    I believe it was October 27th.

16    Q.    2011?

17    A.    Yes, 2011.

18    Q.    So the beginning period was September 22,

19  2011, and the end period was October 27, 2011?

20    A.    Correct.

21    Q.    All right.  And looking at that time

22  period you were able to find the total number of

23  disclosures that are in your -- in Interrogatory

24  Responses Garst 3 and 4, correct?

1      A.    Correct.

2      Q.    Now, I suppose the same person could have

3  requested their online disclosure more than once,

4  is that correct?

5      A.    That is correct.

6      Q.    So there could be some level of

7  duplication of the same consumer getting a

8  defective disclosure more than once during this

9  time period?

10     A.    There could be.  I don't recall doing an

11 analysis to determine if I deduped them from those

12 lists.

13     Q.    If you did not dedupe, would your Excel

14 spreadsheet help you to conduct that type of

15 analysis and eliminate any duplicates?

16     A.    Yes.

17     Q.    Would you typically dedupe when you do

18 this type of an analysis?

19     A.    Yes.  My assumption right now is that I

20 did dedupe them because I am typically asked to do

21 that by the requestors of the information.  I just

22 can't remember right now actually doing it.

23     Q.    Okay.  Is there any other part of your

24 analysis in arriving at those figures that we see

1  in Interrogatory Response No. 1 for the Miller case

2  and separately for the Larson case which you have

3  not explained today?

4      A.    I don't believe so.

5      Q.    Okay.  And going back to the previous

6  subject matter that you testified about, is there

7  any part of the quality control in testing of the

8  online disclosure of the OFAC data between

9  September 22, 2011, and October 27, 2011, which you

10  have not testified about today?

11     A.    I think the only thing that I would say

12  about the quality control is that it was rare for

13  us to have defects from the Saksoft development

14  team.  As for of all of the development teams that

15  we have worked with to develop functionality around

16  the consumer relations platform, Saksoft was one

17  that typically had very high quality.

18     Q.    And you know how earlier in the day you

19  told me of other instances where bugs as we call

20  them were not caught during the program development

21  process?  Yes?

22     A.    Yes.

23     Q.    How many different vendors for program

24  developing does Trans Union use?

**JAMES GARST-CONFIDENTIAL**

1    A.    We have during the time -- during the time

2    of this incident we were working with Saksoft for

3    the online disclosure development, we were also

4    working with its Cap Gemini now, and the name of

5    the company escapes me.  Before they became

6    Cap Gemini, that had happened between then and now,

7    but we had a vendor that provided development and

8    testing resources for other areas of the consumer

9    relations platform, system platform.  And, then, we

10   had also Trans Union associates who were analysts,

11   developers and testers on the platform.

12   Q.    And among those three groups, Saksoft,

13   Cap Gemini and the Trans Union in-house folks, who

14   had -- have you ever conducted a study as to who

15   had the highest frequency of programming errors?

16   A.    No, we have never conducted a study like

17   that.

18   Q.    Okay.  Is it just anecdotal that you're

19   saying that among those three groups your

20   perception is that Saksoft was the one least likely

21   to not catch the bugs?

22   A.    Yes.

23   Q.    But you can't tell me right now that

24   Saksoft catches its bugs on such percentage of

**JAMES GARST-CONFIDENTIAL**

1  programming projects as opposed to Cap Gemini as

2  opposed to Trans Union in-house?

3      A.   No, I cannot.

4      Q.   And do you know overall how many

5  programming bugs Saksoft has not been able to catch

6  in its testing in relation to the total number of

7  projects that Trans Union has given it to program?

8      A.   No, I do not.

9      Q.   Have you ever conducted this type of an

10  analysis?

11      A.   No.

12      Q.   Even after this situation you didn't go

13  back and take a look at how frequently Saksoft does

14  the job right?

15      A.   That's correct.

16      MR. SOUMILAS:  Let's go off the record.

17      THE VIDEOGRAPHER:  The time is 11:32.  We are

18  off the record.  That's the end of disc number one.

19  The time is 11:33.  We are off the record.

20                    (Whereupon, there

21                     was a short break.)

22      THE VIDEOGRAPHER:  This is the beginning of

23  disc number two.  The time is 11:38.  We are back

24  on the record.

1  sampled it was 35 percent, you were looking at

2  nationwide correct?

3      A.   Correct.

4      Q.   You had no reason to be looking at these

5  jurisdictions involved in the litigation

6  subsequently?

7      A.   Correct.

8      Q.   And nationwide you think that Trans Union

9  delivers approximately 25 to 30,000 online

10  disclosures to consumers?

11      A.   That number comes to mind, but I would

12  prefer to go back and look at our reports on

13  disclosure of matrix to prove that.  I can't

14  remember if 25 to 30,000 is total number of

15  disclosures per day or total number of online

16  disclosures per day.

17      Q.   Okay.  But that's your best estimate

18  today?

19      A.   That's my best estimate today.

20      Q.   Okay.  Also I asked you about whether

21  Trans Union was able to track the number of

22  consumer disputes concerning the OFAC defect

23  between September 22nd, 2011, and October 19th or

24  20th, 2011.  Remember that testimony?

**JAMES GARST-CONFIDENTIAL**

1  was after -- any time after the disclosure was --

2  any time with -- let me correct myself again.

3         It was any time within a month after they

4  received their disclosure.

5     Q.   Okay.  So, I am not sure if that answers

6  my question, so let me go back to it again.

7         After October 20th and before the fix was

8  actually rolled out, did Trans Union track the

9  total number of consumer disputes concerning the

10  defective OFAC section on the file disclosure?

11    A.   I don't know.  I know the IT team would

12  not have been able to do that.  The operations team

13  would be the ones who would have to do that, and I

14  am not sure if they ever did that.

15    Q.   Speaking for Trans Union today, you're not

16  aware of any such tracking?

17    MR. NEWMAN:  Objection, outside the scope of

18  the notice.  Go ahead.

19    THE WITNESS:  Correct.

20  BY MR. SOUMILAS:

21    Q.   Okay.  Let's move on to Mr. Miller, and I

22  understand that you gathered some information about

23  what information was disclosed or sold about

24  Mr. Miller through your discussions with

**JAMES GARST-CONFIDENTIAL**

1  STATE OF ILLINOIS )

2                    )  SS:

3  COUNTY OF L A K E )

4        I, Elvira M. Molnar, a Certified Shorthand

5  Reporter of the State of Illinois, do hereby

6  certify:

7        That previous to the commencement of the

8  examination of the witness, the witness was duly

9  sworn to testify the whole truth concerning the

10  matters herein;

11        That the foregoing deposition transcript

12  was reported stenographically by me, was thereafter

13  reduced to typewriting under my personal direction

14  and constitutes a true record of the testimony

15  given and the proceedings had;

16        That the said deposition was taken before

17  me at the time and place specified;

18        That the reading and signing by the

19  witness of the deposition transcript was agreed

20  upon as stated herein;

21        That I am not a relative or employee or

22  attorney or counsel, nor a relative or employee of

23  such attorney or counsel for any of the parties

24  hereto, nor interested directly or indirectly in

**JAMES GARST-CONFIDENTIAL**

1   the outcome of this action.

2        IN WITNESS WHEREOF, I do hereunto set my

3   hand and affix my seal of office at Chicago,

4   Illinois, this 5th day of November, 2014.

5

6

7   _____

8   C.S.R. Certificate No. 84-3309.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JAMES GARST-CONFIDENTIAL

1                  SIGNATURE PAGE

2                   - - -

3           I hereby acknowledge that I

4     have read the aforegoing transcript, dated

5     November 4, 2014, and the same is a true and

6     correct transcription of the answers given by

7     me to the questions propounded, except for

8     the changes, if any, noted on the errata

9     sheet.

10                   - - -

11

12

13   SIGNATURE: _____
                    James Garst

14

15   DATE: _____

16

17   WITNESSED BY: _____

18

19

20

21

22

23

24

ERRATA SHEET

Attach to Deposition of:  James Garst
Taken on:  November 4, 2014
Case:  Miller/Larson v. Trans Union, LLC

| Page:Line | Change |
|---|---|
| Multiple | Change "Trans Union" to "TransUnion"; Change "Saneal" to "Sanil"; Change "Gonaypathen" to "Gopinathan" ; Change "Burdell" to "Briddell" |
| 13:5, 10, 14, 19 | Change "Due Point" to "Dewpoint" |
| 13:10 | Change "Axis Limited" to "Aksys, Ltd." |
| 14:21 | Change "Due Point" to "Dewpoint" |
| 15:21 | Change "advisor" to "senior advisor" |
| 17:11 | Change "legal compliance" to "legal, compliance" |
| 21:12-15 | Change "disclosure itself, including the last 30 months of account history data beyond the consumers payment pattern.  An additional number of names and addresses and phone numbers on the credit file" to "disclosure itself, including the last 30 months of account history data and an additional number of addresses and phone numbers on the credit file" |
| 36:21 | Delete "and" |

<p style="text-align:center; font-size:2em;">Redacted</p>

| | |
|---|---|
| 54:24 | Change "disclosures" to "disclosures for consumers who were possible OFAC matches" |
| 56:23 | Change "project" to "projects" |
| 61:2 | Delete "for" |
| 67:6 | Change "district" to "circuit" |

<p style="text-align:center; font-size:2em;">Redacted</p>

| | |
|---|---|
| 78:23 | Change "X amount" to "XML" |
| 79:10 | Change "Friday" to "Friday (October 21)" |
| 82:15 | Change "cases" to "cases, but the OFAC header change was not a change to the full disclosure" |
| 88:19-22 | Replace text with "The data in the Excel spreadsheet does not appear to be deduped." |
| 91:11, 15 | Add "I did not personally." |
| 92:20 | Change "20 or 30,000" to "30 or 35,000" |
| 93:9, 14 | Change "20 or 30,000" to "30 or 35,000" |

James Garst