# EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD J. MILLER, on behalf : Civil Action
of  himself and all others :
similarly situated,        :
                Plaintiff, : No. 12-1715
        -v-                :
TRANS UNION, LLC,          :
                Defendant. : CLASS ACTION
------------------------------------------
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

BRIAN DOUGLAS LARSON, on   : Case No.
behalf of  himself and all :
others similarly situated, :
                Plaintiff, :
        -v-                :
                           :
                           :
TRANS UNION, LLC,          :
                Defendant. : 3:12cv-05726
------------------------------------------

CONFIDENTIAL COPY

CONFIDENTIAL DEPOSITION

        Oral videotaped deposition of JAMES GARST,

taken at 1450 East Touhy Avenue, Des Plaines,

Illinois, on Tuesday, November 4, 2014, beginning

at approximately 9:00 a.m., before Elvira Molnar,

Certified Shorthand Reporter of the State of

Illinois.

        SUMMIT COURT REPORTING, INC.
    Certified Court Reporters and Videographers
            1500 Walnut Street, Suite 1610
            Philadelphia, Pennsylvania 19102
    424 Fleming Pike, Hammonton, New Jersey 08037
    (215) 985-2400 * (800) 447-8648 * (609) 567-3315
                www.summitreporting.com

**JAMES GARST-CONFIDENTIAL**

```
 1    APPEARANCES:

 2         FRANCIS & MAILMAN, P.C.
           BY:  JOHN SOUMILAS, ESQUIRE
 3         Land Title Building, 19th Floor
           100 South Broad Street
 4         Philadelphia, Pennsylvania 19110
           (215) 735-8600
 5         jsoumilas@consumerlawfirm.com
           Counsel for Plaintiffs
 6
           STROOCK & STROOCK & LAVAN, LLP
 7         BY:  STEPHEN J. NEWMAN, ESQUIRE
           2029 Century Park East
 8         Los Angeles, California 90067
           (310) 556-5800
 9         snewman@stroock.com
           Counsel for the Defendant
10

11    ALSO PRESENT:  MR. KEVIN INGSTRUP - VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    Q.    And the tech lead, Saneal G, we are both

2    having a difficult time with the last name, so

3    we'll just call him Saneal G, why does he stand out

4    in your memory?

5    A.    Because as the tech lead he is the -- he

6    is the primary responsible for the development team

7    and testers responsible for delivering the

8    function.

9    Q.    So that I understand this in plain

10    English, I understand your work is technical in

11    nature, but when we are talking about developing,

12    are we talking about writing the code that will

13    make the disclosure work?

14    A.    Yes.

15    Q.    And when we are talking about testing, are

16    we talking about quality control testing to make

17    sure that it works, the disclosure works, as it's

18    supposed to?

19    A.    Yes.

20    Q.    Okay.  And is Saneal G the person

21    primarily responsible for both the initial code

22    writing and the testing?

23    A.    Yes.

24    Q.    Mr. Garst, are you technically familiar

**JAMES GARST-CONFIDENTIAL**

1  that we have here as Garst 5 for Mr. Miller

2  contained the defect that you searched for?

3      A.   Yes.

4      Q.   And namely the defect had an OFAC message

5  delivered to the consumer, even though one should

6  not have been there at all, correct?

7      A.   Yes.  It had the OFAC header text

8  displayed, even though it should not have

9  displayed.

10     Q.   And the OFAC header text should not have

11  displayed because there is no OFAC match or

12  possible match between this consumer and anything

13  on the OFAC list, correct?

14     A.   Correct.

15     Q.   And am I also correct that part of the

16  defect was that that section under possible OFAC

17  match, the bottom says the OFAC record that is

18  considered a potential match to the name on your

19  credit file is colon, and then there is just

20  nothing after the colon?

21     A.   Correct.

22     Q.   That's part of the defect, correct?

23     A.   Correct.

24     Q.   So, the way the program was supposed to

JAMES GARST-CONFIDENTIAL

1  work was how?

2      A.    The way the program was supposed to work

3  was the -- the web site delivering the disclosure,

4  it reads -- it reads -- the disclosure data is

5  delivered to that web site in an XML format.  The

6  web site is supposed to read that XML.  And if only

7  if there is an OFAC record present in that

8  disclosure XML is it's supposed to display both the

9  header text and the OFAC message itself that would

10  be where this blank space is.

11      Q.    Okay.  So, if I understand this correctly,

12  your testimony is that the reason why the OFAC

13  header appeared had nothing to do with a match on

14  the OFAC list, but everything to do with the fact

15  that Mr. Miller's report contained an inquiry

16  analysis as part of the additional information

17  section?

18      A.    That's correct.

19      Q.    And you said also if that additional

20  information section contained any special messages

21  that would also improperly trigger the OFAC

22  disclosure to appear where it shouldn't, correct?

23      A.    Correct.

24      Q.    Is it your testimony, Mr. Garst, that the

JAMES GARST-CONFIDENTIAL

1  have as Garst 6 suffer from the same defect,
2  correct?

3      A.    Yes.

4      Q.    And let's talk a little bit more about how
5  that came to be.  Are you familiar with when
6  Trans Union originally made any OFAC information
7  available as part of the online disclosures to
8  consumers?

9      A.    We deployed the functionality to display a
10  possible OFAC match section in September of 2011.

11      Q.    Do you remember the exact date?

12      A.    September 22nd, I believe.

13      Q.    And was that functionality not implemented
14  in any form prior to September 22, 2011?

15      A.    Not for the online disclosure.

16      Q.    Okay.  So, could you explain that?

17      A.    Prior to September 22nd, 2011, if the
18  system would check if there was an OFAC message
19  present, it would not deliver the disclosure online
20  if an OFAC message was present.

21      Q.    But if a consumer were to ask for their
22  file disclosure to be mailed to them in paper
23  format at their home, would the system disclose a
24  possible OFAC match?

**JAMES GARST-CONFIDENTIAL**

1   Q.   Would Saneal G be the head of that team?

2   A.   Yes.

3   Q.   Was Saneal G also and his team also

4   responsible for testing the code to make sure that

5   it actually did what it was supposed to do?

6   A.   Yes, separate members on his team.

7   Q.   Do you know who in particular was in

8   charge of testing the code for the OFAC online

9   disclosure to make sure that it functioned as it

10   should?

11   A.   No.

12   Q.   Is Saneal G someone that still works for

13   Trans Union?

14   A.   Saneal G is a tech lead for a vendor used

15   by -- a software vendor used by Trans Union.

16   Q.   Who is that?

17   A.   The vendor is named Saksoft.

18   Q.   As far as you know Saneal G still works

19   for Saksoft?

20   A.   As far as I know, yes.

21   Q.   And is Saksoft someone that Trans Union

22   uses to outsource code writing projects like this

23   one?

24   A.   Yes.  For this one specifically Saksoft

**JAMES GARST-CONFIDENTIAL**

```
 1   was the vendor that we used.
 2       Q.   And that's upper case S-a-k-s and, then,
 3   upper case S-o-f-t, correct?
 4       A.   I -- I am not sure.  I have always written
 5   it as upper case S-a-k-s-o-f-t with no space.
 6       Q.   Okay.  How long has Trans Union used
 7   Saksoft for any code writing jobs?
 8       A.   I don't know.
 9       Q.   Have you worked with that entity before?
10       A.   Yes.
11       Q.   For how long?
12       A.   I don't know specifically.  I can say
13   several years.
14       Q.   Has Saksoft done any projects for you
15   where they programmed code for online disclosures
16   to consumers?
17       A.   Yes, they were the primary development
18   team for any changes that we needed to make for the
19   online disclosure functionality.
20       Q.   For how long?
21       A.   I can say for several years.
22   Brian Thackrey is the best one to ask on that.
23       Q.   Brian Thackrey works for Trans Union?
24       A.   Yes.
```

**JAMES GARST-CONFIDENTIAL**

1    Q.   Would he be the person primarily

2  responsible for hiring Saneal G's team at Saksoft?

3    A.   No.

4    Q.   Who would do that hiring?

5    A.   I don't know.

6    Q.   By 2011 was it understood that Trans Union

7  had a well enough established relationship with

8  Saksoft that if a project was going to have to be

9  handled concerning certain code to add information

10  to the online disclosure that that code was going

11  to be written and tested by Saksoft?

12    A.   Yes.

13    Q.   Did the online disclosure, which would

14  include for the first time the any additional

15  possible OFAC match information, in fact, go online

16  and became available to consumers on September 22,

17  2011?

18    A.   To my understanding, yes.

19    Q.   Did it have the defect that you identified

20  earlier in this deposition?

21    A.   Yes.

22    Q.   From the very first day?

23    A.   Yes.

24    Q.   And how do you know that?

1    to September 22nd, 2011, did not catch the defect?

2    A.   Yes.

3    Q.   The defect was detected later in October

4    you said, correct?

5    A.   Yes.

6    Q.   How did it come -- first come to

7    Trans Union's attention that this defect existed

8    for the online OFAC disclosure?

9    A.   My understanding is that around it was

10    either October 19th or October 20th we got reports

11    from our consumer relations operations group that

12    they were getting phone calls from consumers about

13    seeing the possible OFAC match section on their

14    online disclosures and wanting to dispute it.

15    Q.   Who from consumer relations brought that

16    to whose attention?

17    A.   It was either Lisa Dickens or Denise

18    Burdell, but I can't recall which one of them

19    exactly.

20    Q.   And they brought it to your attention?

21    A.   No.  It was brought to somebody else's

22    attention.

23    Q.   Who -- whose attention was it brought to?

24    A.   I believe it's Brian Thackrey, but I don't

JAMES GARST-CONFIDENTIAL

1    recall exactly.

2    Q.    And is it your understanding that there

3    were consumers who were calling Trans Union with

4    questions or disputes about this OFAC information

5    appearing on their files?

6    A.    It was presented to us as the operations

7    group has operators that are trying to dispute the

8    presence of the OFAC message on consumers' files

9    and not able to do it because that functionality

10   required an OFAC message to be present in order to

11   dispute it.  And since these consumers did not

12   actually have an OFAC message present, they could

13   not dispute it.

14   Q.    So, let me see if I understand this.  The

15   consumers relations operators were trying to

16   process disputes to remove inaccurate OFAC matches,

17   is that correct?

18   A.    They were getting requests from consumers

19   to remove OFAC -- the possible OFAC match, you

20   know, from the consumer's credit report and were

21   unable to.

22   Q.    And the reason why they were unable to is

23   because of this defect, correct?

24   A.    Yes, because the defect -- the defect only

JAMES GARST-CONFIDENTIAL

1    appeared on the online web site itself.  The core

2    consumer relations system that the operators use

3    did not have that defect and did not see an OFAC

4    message present.

5         Q.    So, the operators who would be handling

6    the consumer calls couldn't even really see what

7    the consumers were talking about?

8         A.    That's correct.

9         Q.    How many consumer calls did Trans Union

10   receive between September 22, 2011, when the

11   disclosure for OFAC went online and October 19th or

12   20th when someone from consumer relations brought

13   it to probably Mr. Thackrey's attention?

14        A.    I don't know.

15        Q.    Is there a way of finding that out?

16        A.    Not to my knowledge.

17        Q.    Do you have any reason to believe that

18   the -- there were not calls of that nature

19   throughout the month period between September 22,

20   2011, and October 19th or 20th, 2011?

21        A.    I don't have any way to answer that.  I

22   don't know if -- I don't know if there were calls

23   or not.  The -- historically the consumer relations

24   operations group was very good at notifying us when

**JAMES GARST-CONFIDENTIAL**

1    they -- my understanding of their procedure is they

2    would inform the consumer that they did not find

3    any evidence of an OFAC match on their credit file

4    and historically we would offer to send a

5    disclosure to the consumer to confirm that.

6        Q.    Separate from a disclosure, would

7    Trans Union send any type of written communication

8    to consumers with this type of an inquiry to the

9    effect of you called us or contacted us about OFAC

10    information on your file and we didn't find any or

11    we can't see any?

12        A.    I am not aware of any other communication

13    like that.

14        Q.    Would there be anything unique about the

15    disclosure that would be sent to consumers with

16    that type of an inquiry that would identify that

17    the reason it was sent to them is because they had

18    a dispute about the defect?

19        A.    I am not aware of anything special on

20    disclosure that would have spoken to that defect.

21        Q.    Did you do anything in preparing to give

22    testimony today to find out how many disputes from

23    consumers Trans Union received between

24    September 22, 2011, and October 19th or 20th, 2011,

JAMES GARST-CONFIDENTIAL

1  concerning the defect?

2      A.   I have done some high level querying to

3  look at disputes for the consumers impacted and

4  compare them against the amount of disputes for

5  consumers not impacted in the same areas.  So,

6  California and third district consumers that got

7  their print disclosures --

8      Q.   Yes, sir.

9      A.   -- during that time period and found the

10  dispute rate to be lower for the consumers that had

11  the online disclosure with the possible OFAC match

12  header issue.

13      Q.   So, you are comparing paper disclosures

14  that have a possible match, correct?

15      A.   No.  I was comparing paper disclosures

16  that did not have a possible OFAC match.

17      Q.   So, you're comparing OFAC disclosures that

18  are -- I'm sorry.  Strike that.

19           You were comparing paper file disclosures

20  to consumers that said absolutely nothing about

21  OFAC one way or the other, correct?

22      A.   They were paper disclosures that did not

23  have the OFAC match header, yet did have inquiry

24  analysis or special messages on them.  So, it was

1  the exact same condition --

2      Q.   Right.

3      A.   -- as the online disclosures with the

4  issue, however they did not have the OFAC match

5  header on their disclosures because the defect was

6  not in that channel.

7      Q.   So, I am not sure I get it.  Why would

8  those consumers be disputing about OFAC at all?

9      A.   Let me correct what I am saying.  The

10  dispute rate that I was looking at was any kind of

11  dispute, not an OFAC dispute.  So, I looked

12  specifically at account disputes and anything at

13  all to see in general -- in general were we

14  contacted for dispute activity at a higher rate by

15  the consumers that had this issue.

16      Q.   So you're saying you're comparing any type

17  of dispute that a consumer could make from I paid

18  my credit card on time to I'm a victim of fraud to

19  another person's information is in my report, these

20  inquiries don't belong to me, any type of a dispute

21  whatsoever, on the one hand, correct?

22      A.   That's correct.

23      Q.   For people with a paper file disclosure

24  during that certain time period, correct?

JAMES GARST-CONFIDENTIAL

1  for those consumers because the system does not

2  allow disputing when there is no presence of the

3  OFAC message there itself.  So, I did not -- I did

4  not find -- I did not find OFAC disputes in the

5  system.

6      Q.   Got it.  But you know there must have been

7  disputes, otherwise Ms. Burdell or Ms. Dickens

8  would have had nothing to bring to your attention?

9      A.   Correct.

10     MR. NEWMAN:  Wait for him to finish the

11  question.

12     THE WITNESS:  I understand.  Correct, I am

13  aware of phone calls, phone calls to consumer

14  relations operators complaining or disputing that

15  the presence of the OFAC header information on

16  their files.

17  BY MR. SOUMILAS:

18     Q.   Do you know how -- what percentage of

19  online file disclosures suffered from this defect?

20     A.   On Friday the 21st I did an analysis of

21  all of the disclosures on the 20th that were

22  delivered online on October 20th and found that

23  about 35 percent of the online disclosures

24  delivered would have had the issue based on the

JAMES GARST-CONFIDENTIAL

1  presence of inquiry analysis or special messages on
2  the file.
3      Q.    So that was a sampling of one day,
4  basically?
5      A.    Correct.
6      Q.    Did you do any other samplings for any
7  other time periods concerning the frequency of the
8  defect appearing on online disclosures?
9      A.    I don't recall.
10     Q.    If I understood your testimony correctly
11 about disputes before, because the consumer
12 relations systems operators could not see or
13 address the problem of the defect, there is
14 absolutely no way of knowing how many people
15 actually called and disputed, correct?
16     A.    That's correct.
17     Q.    You know when you reviewed the overall
18 dispute rates between paper disclosures and online
19 disclosures that you testified about previously?
20     A.    Yes.
21     Q.    What was in terms of percentages the
22 overall dispute rate for paper disclosures?
23     A.    I don't remember the exact number.  I
24 ███████████████████████████████████████████

JAMES GARST-CONFIDENTIAL



12      THE WITNESS:  The analysis that I did was -- I

13  would say not without doing further analysis.  The

14  analysis I did was for a very specific time period

15  in 2011, and I am not sure that that represents

16  current state or, you know, other times, you know,

17  during the history of the consumer relations

18  platform.

19  BY MR. SOUMILAS:

20      Q.    I'm sorry, you looked at what time period?

21      A.    I looked for disputes, disputes that came

22  in from consumers within a month of getting their

23  online disclosure or their print disclosure with

24  those conditions.

**JAMES GARST-CONFIDENTIAL**

1    Q.   But this was in the September/October

2   2011, time frame, correct?

3    A.   Correct.

4   ████    ████████████████████████████

5  █ ██████████ ███████

6    A.   Correct.

7    Q.   Would you agree with me that if the OFAC

8   header was disputed with the same overall frequency

9   as other types of disputes that Trans Union would

10  have received, I don't know what the math is

11  exactly, but hundreds of disputes per day about the

12  OFAC defect if, in fact, ████████ ███ ███ ████

13  ████████████ ██████

14    MR. NEWMAN:  Objection, incomplete

15  hypothetical, calls for speculation.

16    THE WITNESS:  If the dispute rate for OFAC was

17  similar to dispute rate for other items on the

18  credit file, then, yes.  However, the dispute rate

19  -- my knowledge of dispute rate for OFAC, you know,

20  is not the same as dispute rate for other items

21  based on my experience looking at the data.

22  BY MR. SOUMILAS:

23    Q.   Okay.  At any rate, we don't know the

24  exact number of disputes because they were just not

**JAMES GARST-CONFIDENTIAL**

1  tracked because the system would just not allow it

2  to be tracked because of this defect?

3      A.    Correct.

4      Q.    All right.  But once the problem is

5  brought to your attention, your team's attention,

6  October 19th and 20th, do they fix it?

7      A.    We fixed it.  We fixed it by October 28th.

8      Q.    How long did the fix take?

9      A.    Can you -- I don't understand the

10  question.

11     Q.    Okay.  Strike the question, actually.

12          Other than consumers, did anybody else

13  bring to Trans Union's attention that this defect

14  was causing OFAC information to appear on the

15  consumer files of consumers who had no association

16  with the OFAC list whatsoever?

17     A.    It was brought to our attention on

18  October 27th that the treasury -- Department of the

19  Treasury, the actual OFAC office had called our

20  legal counsel to let them know that they had been

21  getting calls from consumers.

22     Q.    So the Department of the Treasury OFAC

23  office brought this defect to Trans Union's

24  attention for the first time on October 27th,

**JAMES GARST-CONFIDENTIAL**

1  correct?

2      A.    It was brought to the IT team by our

3  internal legal counsel on the 27th.  My

4  understanding is that she had a call with the

5  Department of the Treasury the day before on the

6  26th.

7      Q.    The defect was corrected on the 28th?

8      A.    Correct.

9      Q.    Do you know what was done to correct the

10  defect?

11      A.    It was a -- there was a code fix made to

12  ensure that the OFAC header only displayed when an

13  OFAC match was sent in the X amount to the

14  receiving application.

15      Q.    What was the code fix?  What specifically

16  was done?

17      A.    I can't speak to the specific code fix

18  itself.

19      Q.    Who performed the code fix?

20      A.    The Saksoft development team.

21      Q.    Was it Saneal G and his team?

22      A.    Correct.

23      MR. NEWMAN:  We have been going for a while.

24  Should we take a little break?

**JAMES GARST-CONFIDENTIAL**

1   OFAC match when there was none, correct?

2       A.   It would not result in the OFAC header,

3   the possible OFAC match header text appearing.

4       Q.   Was the coding defect fix one that was

5   written by your vendor Saksoft?

6       A.   Yes.

7       Q.   In your experience as a program manager,

8   would you consider that type of a fix to a defect a

9   relatively straightforward one?

10      A.   I am not sure if I would call it

11  relatively straightforward or not.

12      Q.   Okay.  Was it easy?

13      A.   I don't know.

14      Q.   How long did it take?

15      A.   My understanding is they started working

16  on it on Friday the 21st and we were -- they were

17  coding and testing the fix on that following

18  Monday, and that there was an attempt to -- failed

19  attempt to actually deploy the fix on that Tuesday,

20  and then it was successfully deployed by that

21  Friday.

22      Q.   By the following Friday?

23      A.   By the following Friday.

24      Q.   Did --

**JAMES GARST-CONFIDENTIAL**

1    A.    That was the 28th.  So, it attempted -- we

2    attempted to deploy it on the 25th and instead it

3    went in on the 28th.

4    Q.    Did Saksoft bill Trans Union for this

5    coding error fix?

6    A.    I am not privy to those details.

7    Q.    Would they normally bill you for the work

8    that they do?

9    A.    I have not been involved in that.

10   Q.    Do you know how much time it took them to

11   recode this program so that the fix took effect?

12   A.    No.

13   Q.    Do you know whether it was closer to one

14   hour or five minutes or 20 hours?

15   A.    No, I don't.

16   Q.    You have no idea?

17   A.    No.

18   Q.    Do you know technically what they needed

19   to change in the code in order for the fix to take

20   effect?

21   A.    I know to a certain level that technically

22   to fix the area of the code that was interpreting

23   the X amount for displaying the OFAC -- the

24   possible OFAC match header text.

**JAMES GARST-CONFIDENTIAL**

1    Q.    And what is your understanding how would

2  you fix that part of the code?

3    A.    My understanding is they had to -- that's

4  level of detail I can't speak to.

5    Q.    Was it your understanding that Trans Union

6  advised Saksoft of the urgency of this fix only

7  after the Department of Treasury contacted

8  Trans Union?

9    A.    No.   I -- we -- there was escalation as

10  soon as Friday to my remembrance of, you know, to

11  the Saksoft team that this was very important,

12  which is why we were trying to get the fix in on

13  the 25th.

14    Q.    Okay.   Did you see any type of a written

15  report or anything in writing to memorialize the

16  fix?

17    A.    No.

18    Q.    Do you agree with the proposition that

19  quality control testing prior to September 22nd,

20  2011, was conducted solely by Saksoft and not by

21  Trans Union?

22    MR. NEWMAN:   Objection.   Go ahead.

23    THE WITNESS:   I don't have specific remembrance

24  of exactly who did the quality control testing.

JAMES GARST-CONFIDENTIAL

1    in Interrogatory Response No. 1 for the Miller case

2    and separately for the Larson case which you have

3    not explained today?

4        A.    I don't believe so.

5        Q.    Okay.  And going back to the previous

6    subject matter that you testified about, is there

7    any part of the quality control in testing of the

8    online disclosure of the OFAC data between

9    September 22, 2011, and October 27, 2011, which you

10   have not testified about today?

11       A.    I think the only thing that I would say

12   about the quality control is that it was rare for

13   us to have defects from the Saksoft development

14   team.  As for of all of the development teams that

15   we have worked with to develop functionality around

16   the consumer relations platform, Saksoft was one

17   that typically had very high quality.

18       Q.    And you know how earlier in the day you

19   told me of other instances where bugs as we call

20   them were not caught during the program development

21   process?  Yes?

22       A.    Yes.

23       Q.    How many different vendors for program

24   developing does Trans Union use?

JAMES GARST-CONFIDENTIAL

1    A.    We have during the time -- during the time

2    of this incident we were working with Saksoft for

3    the online disclosure development, we were also

4    working with its Cap Gemini now, and the name of

5    the company escapes me.  Before they became

6    Cap Gemini, that had happened between then and now,

7    but we had a vendor that provided development and

8    testing resources for other areas of the consumer

9    relations platform, system platform.  And, then, we

10   had also Trans Union associates who were analysts,

11   developers and testers on the platform.

12   Q.    And among those three groups, Saksoft,

13   Cap Gemini and the Trans Union in-house folks, who

14   had -- have you ever conducted a study as to who

15   had the highest frequency of programming errors?

16   A.    No, we have never conducted a study like

17   that.

18   Q.    Okay.  Is it just anecdotal that you're

19   saying that among those three groups your

20   perception is that Saksoft was the one least likely

21   to not catch the bugs?

22   A.    Yes.

23   Q.    But you can't tell me right now that

24   Saksoft catches its bugs on such percentage of

**JAMES GARST-CONFIDENTIAL**

1    A.    Yes.

2    Q.    Did Trans Union do anything to track the

3    number of consumer disputes between October 20th

4    and October 28th?

5    A.    Not to my knowledge.

6    Q.    You hadn't seen any information about how

7    frequently consumers were disputing during the time

8    that you were working on the fix?

9    A.    The only analysis that I did the questions

10   you asked before were specifically about OFAC

11   disputes.

12   Q.    Yes.

13   A.    I did search -- there is a feature in the

14   consumer relations platform where operators can

15   enter comments free form related to their

16   experience on the phone with the consumer.  ████

17   ████████████████████████  ████████████████████

18   ████████████  █████  ██████████████  █████████

19   ████████████  ████████████████  ████  █████████  ███

20   ██████  █  ███████████████████

21   Q.    For what time period?

22   A.    That was -- that was ever for those

23   consumers.

24       Excuse me.  Let me correct myself.  That

1    A.    No.

2    Q.    Does Trans Union have a copy of them so

3  that we can see them and see what was in it and

4  what was not in it?

5    A.    Not that I know of.

6    Q.    Okay.  We know that Trans Union didn't

7  bill any third party for selling OFAC information

8  to them, correct, about Mr. Miller?

9    A.    Specific to the Capital One October 12th

10 inquiry, correct.

11    Q.    But you don't know about the Wal-Mart one?

12    A.    No.

13    Q.    And you didn't check about the American

14 General Finance or the Travelers Companies?

15    A.    No, I did not.

16    MR. SOUMILAS:  Okay.  So, those are all the

17 questions I have.  Thank you very much.

18                      EXAMINATION

19 BY MR. NEWMAN:

20    Q.    I have a few follow-up questions.  First

21 one is a hypothetical question.  Suppose it's June,

22 2011, and a consumer who does appear on the OFAC

23 list and has OFAC information that Trans Union

24 would deliver in response to a request for a credit

**JAMES GARST-CONFIDENTIAL**

1    report.   Please walk me through what would happen

2    in June, 2011, if that consumer went online to get

3    his free file disclosure.

4        MR. SOUMILAS:   Objection to the form, but you

5    can answer.

6        THE WITNESS:   If a consumer went online to get

7    their disclosure, the web site would make the

8    request to the core consumer relations system

9    asking for the disclosure.   The core system would

10    pull the credit file, and including the OFAC

11    information, would see that there was OFAC

12    information present, and inform the web site that

13    the disclosure could not -- the disclosure itself

14    could not be delivered to the consumer on the web

15    site.

16        What the web site would show is a message

17    indicating that we were sorry we could not deliver

18    their disclosure online with contact information

19    for how they may contact us to get their disclosure

20    sent to them via another method.   So, it would be

21    by phone or by mail.

22    BY MR. NEWMAN:

23        Q.   And if the consumer at that point chose to

24    follow up on that message by requesting his

**JAMES GARST-CONFIDENTIAL**

1  disclosure in another format, would the OFAC

2  information be disclosed to the consumer?

3      A.   Yes.

4      Q.   Another question.  Going back to the

5  testing you had testified about previously.  What

6  was the primary goal of the testing that Saksoft

7  conducted?

8      A.   The primary goal would have been to make

9  sure --

10     MR. SOUMILAS:  Object to the form, by the way,

11 on this.  You can answer.

12     THE WITNESS:  The primary objective would have

13 been to make sure that the OFAC -- the OFAC header

14 text and OFAC message would display if the core

15 system sent the OFAC match information to the

16 system.

17 BY MR. NEWMAN:

18     Q.   In your time working for Trans Union, had

19 you ever heard of a defect occurring that is like

20 the defect we are talking about in this case?

21     A.   No.  Specifically -- specifically, you

22 know, another element on the disclosure -- the

23 presence of another element on the disclosure

24 causing additional content for an unrelated element

JAMES GARST-CONFIDENTIAL

1    to be displayed was not something we had seen

2    before.

3        MR. NEWMAN:  No further questions.

4        MR. SOUMILAS:  Okay.  So, let's close this

5    record.  Thank you very much.

6        THE WITNESS:  Thank you.

7        THE VIDEOGRAPHER:  The time is 11:50.  We are

8    off the record.  This is the end of the deposition.

9                    -   -   -

10            (Whereupon, the proceedings

11            concluded at approximately 11:50 a.m.)

12                    -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

**JAMES GARST-CONFIDENTIAL**

1  STATE OF ILLINOIS )

2                   ) SS:

3  COUNTY OF L A K E )

4         I, Elvira M. Molnar, a Certified Shorthand

5  Reporter of the State of Illinois, do hereby

6  certify:

7         That previous to the commencement of the

8  examination of the witness, the witness was duly

9  sworn to testify the whole truth concerning the

10 matters herein;

11        That the foregoing deposition transcript

12 was reported stenographically by me, was thereafter

13 reduced to typewriting under my personal direction

14 and constitutes a true record of the testimony

15 given and the proceedings had;

16        That the said deposition was taken before

17 me at the time and place specified;

18        That the reading and signing by the

19 witness of the deposition transcript was agreed

20 upon as stated herein;

21        That I am not a relative or employee or

22 attorney or counsel, nor a relative or employee of

23 such attorney or counsel for any of the parties

24 hereto, nor interested directly or indirectly in

JAMES GARST-CONFIDENTIAL

1    the outcome of this action.

2          IN WITNESS WHEREOF, I do hereunto set my

3    hand and affix my seal of office at Chicago,

4    Illinois, this 5th day of November, 2014.

5

6

7

8    C.S.R. Certificate No. 84-3309.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ERRATA SHEET

Attach to Deposition of: James Garst
Taken on: November 4, 2014
Case: Miller/Larson v. Trans Union, LLC

| Page:Line | Change |
|---|---|
| Multiple | Change "Trans Union" to "TransUnion"; Change "Saneal" to "Sanil"; Change "Gonaypathen" to "Gopinathan" ; Change "Burdell" to "Briddell" |
| 13:5, 10, 14, 19 | Change "Due Point" to "Dewpoint" |
| 13:10 | Change "Axis Limited" to "Aksys, Ltd." |
| 14:21 | Change "Due Point" to "Dewpoint" |
| 15:21 | Change "advisor" to "senior advisor" |
| 17:11 | Change "legal compliance" to "legal, compliance" |
| 21:12-15 | Change "disclosure itself, including the last 30 months of account history data beyond the consumers payment pattern. An additional number of names and addresses and phone numbers on the credit file" to "disclosure itself, including the last 30 months of account history data and an additional number of addresses and phone numbers on the credit file" |
| 36:21 | Delete "and" |
| 47:6 | Change "And if" to "If and" |
| 47:8 | Change "it's" to "it" |
| 54:24 | Change "disclosures" to "disclosures for consumers who were possible OFAC matches" |
| 56:23 | Change "project" to "projects" |
| 61:2 | Delete "for" |
| 67:6 | Change "district" to "circuit" |
| 72:4, 10 | Change ███████████ |
| 73:5 | Change ███████████ |
| 75:13 | Change "X amount" to "XML" |
| 78:23 | Change "X amount" to "XML" |
| 79:10 | Change "Friday" to "Friday (October 21)" |
| 82:15 | Change "cases" to "cases, but the OFAC header change was not a change to the full disclosure" |
| 88:19-22 | Replace text with "The data in the Excel spreadsheet does not appear to be deduped." |
| 91:11, 15 | Add "I did not personally." |
| 92:20 | Change ███████████ |
| 93:9, 14 | Change ███████████" |

_____
                    James Garst

JAMES GARST-CONFIDENTIAL

1                          SIGNATURE PAGE

2                              - - -

3              I hereby acknowledge that I

4       have read the aforegoing transcript, dated

5       November 4, 2014, and the same is a true and

6       correct transcription of the answers given by

7       me to the questions propounded, except for

8       the changes, if any, noted on the errata

9       sheet.

10                             - - -

11

12

13      SIGNATURE: _____
                         James Garst
14

15      DATE: ___12/1/14_____

16

17      WITNESSED BY: ___Chad R Cory_____

18

19

20

21

22

23

24