# Exhibit 2

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
            UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF PENNSYLVANIA


RONALD J. MILLER, on behalf : Civil Action
of  himself and all others  :
similarly situated,         :
             Plaintiff,     : No. 12-1715
        -v-                 :
TRANS UNION, LLC,           :
             Defendant.     : CLASS ACTION
-----------------------------------------
            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
              SAN FRANCISCO DIVISION

 BRIAN DOUGLAS LARSON, on   :  Case No.
 behalf of  himself and all :
 others similarly situated, :
             Plaintiff,     :
       -v-                  :
                            :
 TRANS UNION, LLC,          :
             Defendant.     :  3:12cv-05726
-----------------------------------------
```

                CONFIDENTIAL DEPOSITION

        Oral videotaped deposition of JAMES GARST,

taken at 1450 East Touhy Avenue, Des Plaines,

Illinois, on Tuesday, November 4, 2014, beginning

at approximately 9:00 a.m., before Elvira Molnar,

Certified Shorthand Reporter of the State of

Illinois.

                SUMMIT COURT REPORTING, INC.
        Certified Court Reporters and Videographers
              1500 Walnut Street, Suite 1610
                Philadelphia, Pennsylvania 19102
          424 Fleming Pike, Hammonton, New Jersey 08037
          (215) 985-2400 * (800) 447-8648 * (609) 567-3315
                   www.summitreporting.com

JAMES GARST-CONFIDENTIAL

1           Will you be able to give testimony on

2      that?

3           A.   Yes.

4           Q.   Thank you.  And I can tell that you're

5      anticipating some of my questions.  I will just

6      give you an instruction to please wait until I am

7      done, and then I'll give you the same courtesy of

8      waiting until your full answer is done, because

9      that just makes it easier for the court reporter to

10     take down one of us at a time, okay?

11          A.   Uh-huh.

12          Q.   Is that a yes?

13          A.   Yes.

14          Q.   Another instruction is even though we do

15     have a video, I would request that you give me oral

16     responses so we have a clear transcript, as well,

17     okay, sir?

18          A.   Yes.

19          Q.   Now, another topic where I understand you

20     will be prepared to give testimony today speaking

21     for Trans Union is Subject C of Garst 1, where it

22     asks for Trans Union's quality control measures and

23     testing for online communications of information to

24     consumers concerning OFAC alerts or other OFAC

**JAMES GARST-CONFIDENTIAL**

1    related information from February, 2008, to the

2    present.

3            Do you see that?

4    A.    Yes.

5    Q.    And are you able to give testimony on that

6    subject matter for Trans Union today?

7    A.    Yes.

8    Q.    I believe Garst 2 has virtually the same

9    exact question to cover communications related in

10    the Larson case.

11            You're able to give testimony on that

12    subject matter?

13    A.    Yes.

14    Q.    And I believe the last subject area for

15    which you are designated to give some testimony

16    today is in the Miller case, and that is Subject E

17    of Garst 1.  It asks for any sale of OFAC alert or

18    OFAC related information on any reports sold to any

19    third party, so that would be a bank, for example,

20    about the plaintiff, Mr. Miller, from 2007 to the

21    present.

22            Are you able to testify about that?

23    A.    Yes.

24    Q.    Okay.  So, the subject of your testimony

**JAMES GARST-CONFIDENTIAL**

1    Q.   And the tech lead, Saneal G, we are both

2    having a difficult time with the last name, so

3    we'll just call him Saneal G, why does he stand out

4    in your memory?

5    A.   Because as the tech lead he is the -- he

6    is the primary responsible for the development team

7    and testers responsible for delivering the

8    function.

9    Q.   So that I understand this in plain

10   English, I understand your work is technical in

11   nature, but when we are talking about developing,

12   are we talking about writing the code that will

13   make the disclosure work?

14   A.   Yes.

15   Q.   And when we are talking about testing, are

16   we talking about quality control testing to make

17   sure that it works, the disclosure works, as it's

18   supposed to?

19   A.   Yes.

20   Q.   Okay.  And is Saneal G the person

21   primarily responsible for both the initial code

22   writing and the testing?

23   A.   Yes.

24   Q.   Mr. Garst, are you technically familiar

**JAMES GARST-CONFIDENTIAL**

1   with the program code writing to be able to review

2   it yourself for accuracy to make sure that it's

3   done properly?

4       A.   No.

5       Q.   And how about with respect to the testing

6   to see that the code functions as it should, are

7   you technically familiar with how the testing

8   should be done?

9       A.   Yes.

10      Q.   And how -- how did you come to be familiar

11  with the testing aspect?

12      A.   I am familiar with the -- I became

13  familiar with how to test software through the

14  projects that I participated in as a business

15  analyst and a project manager over the course of my

16  career.

17      Q.   Did you have consistent interaction with

18  Saneal G during the time period of the 2011 OFAC

19  online disclosure project?

20      A.   No.

21      Q.   Was there anybody in particular

22  responsible for overseeing the work of Saneal G?

23      A.   Primarily Brian Thackrey.

24      Q.   Anybody else?

JAMES GARST-CONFIDENTIAL

1       A.    Not to my knowledge.

2       Q.    Okay.  During the time period when you

3    were program manager for consumer relations

4    systems, did you yourself personally engage in the

5    testing of any code to see that it was working

6    properly?

7       A.    During some projects I did some testing.

8       Q.    In other projects you had oversight

9    responsibility, but you didn't do the testing

10   yourself?

11      A.    Correct.

12      Q.    But you're familiar with how to do it?

13      A.    Yes.

14      Q.    Have you ever seen projects that you have

15   supervised where the testing had failed and the

16   program did not function as it should?

17      A.    Yes.

18      Q.    How many times?

19      A.    I couldn't estimate.  Defects, what we

20   call defects, are relatively common in software

21   development.

22      Q.    So, when you say defects, is that also

23   sometimes we hear that there is a bug in the

24   program?

**JAMES GARST-CONFIDENTIAL**

1      A.    Yes.

2      Q.    So, is that a relatively frequent

3   occurrence in your experience where there is a bug

4   in a program?

5      A.    Relatively frequent, yes, from a minor --

6   a minor bug or minor defect standpoint, yes.

7      Q.    And are you familiar with other situations

8   where not even the quality control testing at

9   Trans Union caught the bug before the program was

10  rolled out?

11     A.    Yes.

12     Q.    How many such situations during your time

13  at Trans Union?

14     A.    I don't know.

15     Q.    More than 10?

16     A.    Yes.

17     Q.    More than 20?

18     A.    Yes.

19     Q.    More than 50?

20     A.    I don't know.

21     Q.    All right.  Let's shift gears for a moment

22  and talk about what, if anything, you did to

23  prepare to give testimony today on those five I

24  believe subject matters that we went over at the

**JAMES GARST-CONFIDENTIAL**

```
 1    the third circuit and also in the State of
 2    California?
 3         A.    Not -- no.  I did not have the ability to
 4    search for the OFAC header itself.  I -- my queries
 5    searched for the data conditions that led to the
 6    OFAC header appearing.
 7         Q.    Okay.  So, would you explain that for the
 8    record in some more detail?
 9         A.    Sure.  The defect occurred -- the defect
10    of the OFAC header text displaying when it should
11    not have displayed occurred whenever there was any
12    other additional information present on a
13    consumer's file for their disclosure delivered
14    online during the time period of the issue.  The
15    other information that would be there that would
16    have triggered this defect and this display of the
17    header information was either inquiry analysis data
18    being present on the file or a special message.  I
19    believe it's called special messages on here.  Yes,
20    special messages.
21         Q.    Okay.  So, to summarize, your inquiry was
22    for the defect as you called it?
23         A.    Yes.
24         Q.    And you agree with me that the document
```

1    that we have here as Garst 5 for Mr. Miller

2    contained the defect that you searched for?

3        A.   Yes.

4        Q.   And namely the defect had an OFAC message

5    delivered to the consumer, even though one should

6    not have been there at all, correct?

7        A.   Yes.  It had the OFAC header text

8    displayed, even though it should not have

9    displayed.

10        Q.   And the OFAC header text should not have

11    displayed because there is no OFAC match or

12    possible match between this consumer and anything

13    on the OFAC list, correct?

14        A.   Correct.

15        Q.   And am I also correct that part of the

16    defect was that that section under possible OFAC

17    match, the bottom says the OFAC record that is

18    considered a potential match to the name on your

19    credit file is colon, and then there is just

20    nothing after the colon?

21        A.   Correct.

22        Q.   That's part of the defect, correct?

23        A.   Correct.

24        Q.   So, the way the program was supposed to

JAMES GARST-CONFIDENTIAL

1   work was how?

2       A.    The way the program was supposed to work

3   was the -- the web site delivering the disclosure,

4   it reads -- it reads -- the disclosure data is

5   delivered to that web site in an XML format.  The

6   web site is supposed to read that XML.  And if only

7   if there is an OFAC record present in that

8   disclosure XML is it's supposed to display both the

9   header text and the OFAC message itself that would

10  be where this blank space is.

11      Q.    Okay.  So, if I understand this correctly,

12  your testimony is that the reason why the OFAC

13  header appeared had nothing to do with a match on

14  the OFAC list, but everything to do with the fact

15  that Mr. Miller's report contained an inquiry

16  analysis as part of the additional information

17  section?

18      A.    That's correct.

19      Q.    And you said also if that additional

20  information section contained any special messages

21  that would also improperly trigger the OFAC

22  disclosure to appear where it shouldn't, correct?

23      A.    Correct.

24      Q.    Is it your testimony, Mr. Garst, that the

JAMES GARST-CONFIDENTIAL

1    defect was in the appearance of the OFAC header

2    with a colon and nothing afterwards in situations

3    where it should not have appeared at all?

4        A.   Yes.

5        Q.   All right.  The language of the OFAC match

6    header you don't consider to be a defect, correct?

7        MR. NEWMAN:  Objection, outside the scope of

8    the notice.  Go ahead.

9    BY MR. SOUMILAS:

10       Q.   Let me ask it another way.

11            If a program worked as it should, and

12   there was an actual match between a credit

13   applicant and the OFAC list, would you agree with

14   me that the OFAC header would appear here, would

15   appear on the file disclosure?

16       A.   Yes.

17       Q.   And also the matching information from the

18   OFAC list should appear after the colon, correct?

19       A.   Correct.

20       Q.   So, if let's say that there was a match

21   between an applicant named Charles Taylor and a

22   match on the former Liberian president

23   Charles Taylor, that would be a situation where the

24   OFAC header would appear with information after the

1    colon concerning the possible match?

2        MR. NEWMAN:  Objection, incomplete

3    hypothetical.  Go ahead.

4    BY MR. SOUMILAS:

5        Q.   Is that correct?

6        A.   Yes, if Charles Taylor is on the OFAC

7    list.

8        Q.   Right.  And in situations where -- in

9    situations like that where there is someone who is

10   considered to be a potential match, Trans Union

11   continues to use this OFAC header, correct?

12       MR. NEWMAN:  Objection.  Go ahead.

13       THE WITNESS:  My understanding is that yes we

14   continue to use the OFAC header.

15   BY MR. SOUMILAS:

16       Q.   Trans Union considers nothing defective

17   about the header itself, correct?

18       MR. NEWMAN:  Objection, outside the scope of

19   the notice, but go ahead.

20       THE WITNESS:  I am not aware of any current

21   defects related to the OFAC header text or

22   delivery.

23   BY MR. SOUMILAS:

24       Q.   Okay.  And the defect you specifically

JAMES GARST-CONFIDENTIAL

1    searched for is the appearance of the header data

2    with a colon and nothing afterwards in situations

3    where it should not have appeared at all but did

4    because of a programming error, correct?

5        A.    Correct.

6        Q.    And that error somehow caused the OFAC

7    header with a colon and no matching data afterwards

8    to appear in situations where the consumer simply

9    had an inquiry analysis or any special message as

10   part of the additional information section of their

11   file, is that also correct?

12       A.    Correct.

13       Q.    All right.  And that's the case for

14   Mr. Miller as we see here in Garst 5, correct?

15       A.    Uh-huh.

16       Q.    Is that a yes, sir?

17       A.    Yes.

18       Q.    And that's also the case for Mr. Larson,

19   which we see as part of Garst 6, would you agree

20   with that?

21             Yes, please take a look at Garst 6.

22       A.    Yes, I would agree with that.

23       Q.    So, both the Miller disclosure that we

24   have as Garst 5 and the Larson disclosure that we

1    have as Garst 6 suffer from the same defect,

2    correct?

3        A.    Yes.

4        Q.    And let's talk a little bit more about how

5    that came to be.  Are you familiar with when

6    Trans Union originally made any OFAC information

7    available as part of the online disclosures to

8    consumers?

9        A.    We deployed the functionality to display a

10    possible OFAC match section in September of 2011.

11        Q.    Do you remember the exact date?

12        A.    September 22nd, I believe.

13        Q.    And was that functionality not implemented

14    in any form prior to September 22, 2011?

15        A.    Not for the online disclosure.

16        Q.    Okay.  So, could you explain that?

17        A.    Prior to September 22nd, 2011, if the

18    system would check if there was an OFAC message

19    present, it would not deliver the disclosure online

20    if an OFAC message was present.

21        Q.    But if a consumer were to ask for their

22    file disclosure to be mailed to them in paper

23    format at their home, would the system disclose a

24    possible OFAC match?

1      A.    Yes.

2      Q.    Okay.  So, there was a period of time for

3   which there was a possible OFAC match header as you

4   called it as part of paper disclosures, but not

5   online disclosures?

6      A.    Correct.

7      Q.    Do you know when the possible OFAC match

8   header started appearing on the paper disclosures

9   at Trans Union?

10      A.    In February of 2011.

11      Q.    And do you know why at that time the

12   online file disclosures would not show the same

13   thing as the paper version?

14      A.    I don't recall.

15      Q.    Were you involved at all with the project

16   to add the OFAC data header to the paper

17   disclosures in February, 2011?

18      A.    As I was the project -- for the program

19   manager at the time, yes, I would have been the

20   program manager for that project, as well.

21      Q.    Do you have any recollection as to why

22   that additional disclosure field was rolled out at

23   two different time periods; one for the paper

24   disclosures and, then, later about eight months

1   later for the online disclosures?

2       A.   I don't remember the specifics of that

3   decision.

4       Q.   Do you recall who else -- you said you

5   were the project manager for the paper disclosures

6   in February of 2011?

7       A.   The program manager.

8       Q.   Program manager.  Who was the project

9   manager?

10      A.   I don't recall.

11      Q.   Looking back on it, was it Trans Union's

12  intention to not include the OFAC header in online

13  disclosures until a period of time later than the

14  paper disclosures, or was that just an oversight?

15      MR. NEWMAN:  Objection, misstates testimony.

16  Go ahead.

17  BY MR. SOUMILAS:

18      Q.   Do you understand my question?

19      A.   I do understand the question.  It to my

20  remembrance it was not an oversight.  It would have

21  been a deliberate decision based on -- based on

22  variables at the time.

23      Q.   And what do you mean by that?

24      A.   I can speak in generality about the

**JAMES GARST-CONFIDENTIAL**

1    A.    Because when we discovered the defect in

2    -- later in October, we used the support tool for

3    to view the online disclosures that were delivered

4    as far back as when we deployed the functionality

5    on September 22nd and saw the error.

6    Q.    Would you conclude from that that the

7    defect was a result of the original coding for that

8    online disclosure?

9    A.    For that change to the online disclosure,

10   yes.

11   Q.    And would you agree with me that the

12   testing, whatever testing was conducted before the

13   online OFAC disclosure went online on September 22,

14   2011, did not catch the defect?

15   MR. NEWMAN:  Objection, misstates testimony.

16   Go ahead.

17   BY MR. SOUMILAS:

18   Q.    Well, let me break it down.  Are you of

19   the opinion that there was some testing before

20   September 22nd, 2011, to make sure that the OFAC

21   online disclosure was functioning properly?

22   A.    Yes, that was my understanding.

23   Q.    Okay.  And would you agree with me that

24   whatever testing of that code was conducted prior

1    to September 22nd, 2011, did not catch the defect?

2         A.    Yes.

3         Q.    The defect was detected later in October

4    you said, correct?

5         A.    Yes.

6         Q.    How did it come -- first come to

7    Trans Union's attention that this defect existed

8    for the online OFAC disclosure?

9         A.    My understanding is that around it was

10   either October 19th or October 20th we got reports

11   from our consumer relations operations group that

12   they were getting phone calls from consumers about

13   seeing the possible OFAC match section on their

14   online disclosures and wanting to dispute it.

15        Q.    Who from consumer relations brought that

16   to whose attention?

17        A.    It was either Lisa Dickens or Denise

18   Burdell, but I can't recall which one of them

19   exactly.

20        Q.    And they brought it to your attention?

21        A.    No.  It was brought to somebody else's

22   attention.

23        Q.    Who -- whose attention was it brought to?

24        A.    I believe it's Brian Thackrey, but I don't

1   recall exactly.

2      Q.   And is it your understanding that there

3   were consumers who were calling Trans Union with

4   questions or disputes about this OFAC information

5   appearing on their files?

6      A.   It was presented to us as the operations

7   group has operators that are trying to dispute the

8   presence of the OFAC message on consumers' files

9   and not able to do it because that functionality

10  required an OFAC message to be present in order to

11  dispute it.  And since these consumers did not

12  actually have an OFAC message present, they could

13  not dispute it.

14     Q.   So, let me see if I understand this.  The

15  consumers relations operators were trying to

16  process disputes to remove inaccurate OFAC matches,

17  is that correct?

18     A.   They were getting requests from consumers

19  to remove OFAC -- the possible OFAC match, you

20  know, from the consumer's credit report and were

21  unable to.

22     Q.   And the reason why they were unable to is

23  because of this defect, correct?

24     A.   Yes, because the defect -- the defect only

1    appeared on the online web site itself.  The core

2    consumer relations system that the operators use

3    did not have that defect and did not see an OFAC

4    message present.

5        Q.   So, the operators who would be handling

6    the consumer calls couldn't even really see what

7    the consumers were talking about?

8        A.   That's correct.

9        Q.   How many consumer calls did Trans Union

10   receive between September 22, 2011, when the

11   disclosure for OFAC went online and October 19th or

12   20th when someone from consumer relations brought

13   it to probably Mr. Thackrey's attention?

14       A.   I don't know.

15       Q.   Is there a way of finding that out?

16       A.   Not to my knowledge.

17       Q.   Do you have any reason to believe that

18   the -- there were not calls of that nature

19   throughout the month period between September 22,

20   2011, and October 19th or 20th, 2011?

21       A.   I don't have any way to answer that.  I

22   don't know if -- I don't know if there were calls

23   or not.  The -- historically the consumer relations

24   operations group was very good at notifying us when

**JAMES GARST-CONFIDENTIAL**

1    for those consumers because the system does not

2    allow disputing when there is no presence of the

3    OFAC message there itself.  So, I did not -- I did

4    not find -- I did not find OFAC disputes in the

5    system.

6        Q.   Got it.  But you know there must have been

7    disputes, otherwise Ms. Burdell or Ms. Dickens

8    would have had nothing to bring to your attention?

9        A.   Correct.

10   MR. NEWMAN:  Wait for him to finish the

11   question.

12   THE WITNESS:  I understand.  Correct, I am

13   aware of phone calls, phone calls to consumer

14   relations operators complaining or disputing that

15   the presence of the OFAC header information on

16   their files.

17   BY MR. SOUMILAS:

18       Q.   Do you know how -- what percentage of

19   online file disclosures suffered from this defect?

20       A.   On Friday the 21st I did an analysis of

21   all of the disclosures on the 20th that were

22   delivered online on October 20th and found that

23   REDACTED percent of the online disclosures

24   delivered would have had the issue based on the

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

**JAMES GARST-CONFIDENTIAL**

1    presence of inquiry analysis or special messages on

2    the file.

3         Q.   So that was a sampling of one day,

4    basically?

5         A.   Correct.

6         Q.   Did you do any other samplings for any

7    other time periods concerning the frequency of the

8    defect appearing on online disclosures?

9         A.   I don't recall.

10        Q.   If I understood your testimony correctly

11   about disputes before, because the consumer

12   relations systems operators could not see or

13   address the problem of the defect, there is

14   absolutely no way of knowing how many people

15   actually called and disputed, correct?

16        A.   That's correct.

17        Q.   You know when you reviewed the overall

18   dispute rates between paper disclosures and online

19   disclosures that you testified about previously?

20        A.   Yes.

21        Q.   What was in terms of percentages the

22   overall dispute rate for paper disclosures?

23        A.   I don't remember the exact number.  I

24   remember it being around REDACTED

**JAMES GARST-CONFIDENTIAL**

1      REDACTED

2          Q.    And how about for online disclosures by

3      comparison?

4          A.    I believe it was around REDACTED .   I

5      remember the difference being REDACTED

6          Q.    Do you infer from that that the overall

7      dispute rate for any type of a problem that a

8      consumer brings to Trans Union's attention either

9      as a result of an online disclosure or a paper

10     disclosure is roughly between REDACTED  percent

11     of the time?

12         THE WITNESS:  The analysis that I did was -- I

13     would say not without doing further analysis.  The

14     analysis I did was for a very specific time period

15     in 2011, and I am not sure that that represents

16     current state or, you know, other times, you know,

17     during the history of the consumer relations

18     platform.

19     BY MR. SOUMILAS:

20         Q.    I'm sorry, you looked at what time period?

21         A.    I looked for disputes, disputes that came

22     in from consumers within a month of getting their

23     online disclosure or their print disclosure with

24     those conditions.

**JAMES GARST-CONFIDENTIAL**

1    Q.    But this was in the September/October

2   2011, time frame, correct?

3    A.    Correct.

4    Q.    And you found them to be between REDACTED

5   REDACTED percent, correct?

6    A.    Correct.

7    Q.    Would you agree with me that if the OFAC

8   header was disputed with the same overall frequency

9   as other types of disputes that Trans Union would

10  have received, I don't know what the math is

11  exactly, but REDACTED disputes per day about the

12  OFAC defect if, in fact, there were REDACTED such

13  disclosures per day?

14    MR. NEWMAN:  Objection, incomplete

15  hypothetical, calls for speculation.

16    THE WITNESS:  If the dispute rate for OFAC was

17  similar to dispute rate for other items on the

18  credit file, then, yes.  However, the dispute rate

19  -- my knowledge of dispute rate for OFAC, you know,

20  is not the same as dispute rate for other items

21  based on my experience looking at the data.

22  BY MR. SOUMILAS:

23    Q.    Okay.  At any rate, we don't know the

24  exact number of disputes because they were just not

JAMES GARST-CONFIDENTIAL

1    tracked because the system would just not allow it

2    to be tracked because of this defect?

3        A.    Correct.

4        Q.    All right.  But once the problem is

5    brought to your attention, your team's attention,

6    October 19th and 20th, do they fix it?

7        A.    We fixed it.  We fixed it by October 28th.

8        Q.    How long did the fix take?

9        A.    Can you -- I don't understand the

10    question.

11        Q.    Okay.  Strike the question, actually.

12            Other than consumers, did anybody else

13    bring to Trans Union's attention that this defect

14    was causing OFAC information to appear on the

15    consumer files of consumers who had no association

16    with the OFAC list whatsoever?

17        A.    It was brought to our attention on

18    October 27th that the treasury -- Department of the

19    Treasury, the actual OFAC office had called our

20    legal counsel to let them know that they had been

21    getting calls from consumers.

22        Q.    So the Department of the Treasury OFAC

23    office brought this defect to Trans Union's

24    attention for the first time on October 27th,

1    correct?

2        A.    It was brought to the IT team by our

3    internal legal counsel on the 27th.  My

4    understanding is that she had a call with the

5    Department of the Treasury the day before on the

6    26th.

7        Q.    The defect was corrected on the 28th?

8        A.    Correct.

9        Q.    Do you know what was done to correct the

10   defect?

11       A.    It was a -- there was a code fix made to

12   ensure that the OFAC header only displayed when an

13   OFAC match was sent in the X amount to the

14   receiving application.

15       Q.    What was the code fix?  What specifically

16   was done?

17       A.    I can't speak to the specific code fix

18   itself.

19       Q.    Who performed the code fix?

20       A.    The Saksoft development team.

21       Q.    Was it Saneal G and his team?

22       A.    Correct.

23       MR. NEWMAN:  We have been going for a while.

24   Should we take a little break?

**JAMES GARST-CONFIDENTIAL**

1    BY MR. SOUMILAS:

2        Q.    Do you have -- have you reviewed any

3    record of any quality control testing conducted by

4    Trans Union concerning the 2011 OFAC online

5    disclosure prior to it being rolled out on

6    September 22nd, 2011?

7        A.    Not in any of the materials that I

8    reviewed.

9        Q.    Okay.  Have you reviewed any record of any

10   quality control testing by Saksoft concerning the

11   OFAC online disclosure prior to October 22nd, 2011?

12       A.    No, not in any of the materials I

13   reviewed.

14       Q.    Would you agree with the proposition that

15   the testing failed to catch the defect?

16   MR. NEWMAN:  Objection, vague as to time.

17   BY MR. SOUMILAS:

18       Q.    The testing failed to catch the defect

19   prior to it being rolled -- the online disclosure

20   being rolled out on September 22nd, 2011?

21       A.    Yes.

22       Q.    And what could have been done in your

23   experience to avoid that defect in the first place?

24       A.    In my experience overall you could do more

JAMES GARST-CONFIDENTIAL

1    testing.  You could involve more people doing the

2    testing.  You could -- those were the two -- those

3    are the two main concepts I would introduce.

4        Q.   All right.  And more testing are you

5    talking about a review of the code after it's

6    written, is that part of the testing that could

7    have been done?

8        A.   Yes.  So, testing could include more

9    deeper code review with -- with additional people.

10   It could involve performing more test cases, you

11   know, against that code.  Things like that.

12       Q.   So, you're familiar with dynamic testing

13   of software programs?  Are you familiar with that

14   concept?

15       A.   I am not familiar with the concept of

16   dynamic testing.  I don't know what that is.

17       Q.   Okay.  Are you familiar with static

18   testing of computer programs like these?

19       A.   This -- not this specific terminology.

20       Q.   Okay.  Are you familiar with white box

21   testing?

22       A.   I am familiar with it, but could not

23   explain it.

24       Q.   How about black box testing?

**JAMES GARST-CONFIDENTIAL**

1    A.    Again, I am familiar with it, but could

2    not explain it.

3    Q.    How about gray box testing?

4    A.    I am not familiar with that.

5    Q.    Okay.  Are you aware of how many test

6    cases the code was tested on prior to September 22,

7    2011, before it went online, to determine whether

8    it was working properly?

9    A.    No.

10    Q.    Are you familiar with how many test cases

11    Trans Union would typically run to test an online

12    disclosure before making it available to the

13    general public?

14    A.    Typically for the full disclosures there

15    are hundreds of test cases.

16    Q.    How many hundreds?

17    A.    I don't know specifically.

18    Q.    How many test cases were conducted with

19    respect to the OFAC online disclosure prior to

20    September 22, 2011?

21    A.    I don't know.

22    Q.    Do you know how much money Trans Union

23    paid Saksoft for its programming services to roll

24    out the online OFAC disclosure prior to

JAMES GARST-CONFIDENTIAL

1    September 22, 2011?

2        A.    No.

3        Q.    After the defect was brought to

4    Trans Union's attention, did Trans Union go back

5    and specifically inquire with Saksoft about what

6    type of testing it had conducted before rolling out

7    the disclosure online?

8        A.    I -- in the materials I saw that it was

9    the specific question of was it tested, you know,

10   as it was specified, and the answer was yes.

11       Q.    So, the materials you mean e-mail?

12       A.    Correct.

13       Q.    So, do you know specifically as a

14   follow-up to that e-mail what type of testing

15   Saksoft conducted on the OFAC online product before

16   making it available to consumers online on

17   September 22, 2011?

18       A.    No, I don't know specifically.

19       Q.    And during the time of the fix did

20   Trans Union go back and get any type of an audit or

21   a report from Saksoft as to what failed in the

22   testing in the first instance which did not catch

23   the defect?

24       A.    I don't know.

1    Q.    You are here to testify on behalf of

2    Trans Union, Mr. Garst, on the subject of quality

3    control measures and testing for online

4    communications of information to consumers

5    concerning OFAC alerts.  What specific item of

6    quality control testing are you familiar with which

7    Trans Union conducted prior to rolling out the

8    online OFAC file disclosure on September 22, 2011?

9    A.    I am familiar with the general process and

10   procedure with which we developed and tested

11   applications.

12   Q.    Are you familiar with a single specific

13   test or quality control measure that was, in fact,

14   followed in the case of preparing the OFAC online

15   disclosure prior to September 22, 2011?

16   A.    Not specifically.

17   Q.    Would you agree with me that whatever

18   testing, if any, quality control testing was

19   conducted, it failed to catch this defect?

20   A.    I would agree.

21   Q.    Turning your attention, Mr. Garst, to

22   Garst 3 and 4.  Those were the interrogatory

23   responses.  You will recall that we had talked

24   about Interrogatory Response No. 1 in both exhibits

1    in Interrogatory Response No. 1 for the Miller case

2    and separately for the Larson case which you have

3    not explained today?

4        A.    I don't believe so.

5        Q.    Okay.  And going back to the previous

6    subject matter that you testified about, is there

7    any part of the quality control in testing of the

8    online disclosure of the OFAC data between

9    September 22, 2011, and October 27, 2011, which you

10   have not testified about today?

11       A.    I think the only thing that I would say

12   about the quality control is that it was rare for

13   us to have defects from the Saksoft development

14   team.  As for of all of the development teams that

15   we have worked with to develop functionality around

16   the consumer relations platform, Saksoft was one

17   that typically had very high quality.

18       Q.    And you know how earlier in the day you

19   told me of other instances where bugs as we call

20   them were not caught during the program development

21   process?  Yes?

22       A.    Yes.

23       Q.    How many different vendors for program

24   developing does Trans Union use?

**JAMES GARST-CONFIDENTIAL**

1    A.    We have during the time -- during the time

2   of this incident we were working with Saksoft for

3   the online disclosure development, we were also

4   working with its Cap Gemini now, and the name of

5   the company escapes me.  Before they became

6   Cap Gemini, that had happened between then and now,

7   but we had a vendor that provided development and

8   testing resources for other areas of the consumer

9   relations platform, system platform.  And, then, we

10   had also Trans Union associates who were analysts,

11   developers and testers on the platform.

12    Q.    And among those three groups, Saksoft,

13   Cap Gemini and the Trans Union in-house folks, who

14   had -- have you ever conducted a study as to who

15   had the highest frequency of programming errors?

16    A.    No, we have never conducted a study like

17   that.

18    Q.    Okay.  Is it just anecdotal that you're

19   saying that among those three groups your

20   perception is that Saksoft was the one least likely

21   to not catch the bugs?

22    A.    Yes.

23    Q.    But you can't tell me right now that

24   Saksoft catches its bugs on such percentage of

JAMES GARST-CONFIDENTIAL

1   programming projects as opposed to Cap Gemini as

2   opposed to Trans Union in-house?

3        A.   No, I cannot.

4        Q.   And do you know overall how many

5   programming bugs Saksoft has not been able to catch

6   in its testing in relation to the total number of

7   projects that Trans Union has given it to program?

8        A.   No, I do not.

9        Q.   Have you ever conducted this type of an

10  analysis?

11       A.   No.

12       Q.   Even after this situation you didn't go

13  back and take a look at how frequently Saksoft does

14  the job right?

15       A.   That's correct.

16       MR. SOUMILAS:  Let's go off the record.

17       THE VIDEOGRAPHER:  The time is 11:32.  We are

18  off the record.  That's the end of disc number one.

19  The time is 11:33.  We are off the record.

20                 (Whereupon, there

21                 was a short break.)

22       THE VIDEOGRAPHER:  This is the beginning of

23  disc number two.  The time is 11:38.  We are back

24  on the record.

**JAMES GARST-CONFIDENTIAL**

1  STATE OF ILLINOIS )

2                    )  SS:

3  COUNTY OF L A K E )

4        I, Elvira M. Molnar, a Certified Shorthand

5  Reporter of the State of Illinois, do hereby

6  certify:

7        That previous to the commencement of the

8  examination of the witness, the witness was duly

9  sworn to testify the whole truth concerning the

10 matters herein;

11       That the foregoing deposition transcript

12 was reported stenographically by me, was thereafter

13 reduced to typewriting under my personal direction

14 and constitutes a true record of the testimony

15 given and the proceedings had;

16       That the said deposition was taken before

17 me at the time and place specified;

18       That the reading and signing by the

19 witness of the deposition transcript was agreed

20 upon as stated herein;

21       That I am not a relative or employee or

22 attorney or counsel, nor a relative or employee of

23 such attorney or counsel for any of the parties

24 hereto, nor interested directly or indirectly in